JOURNAL ENTRY AND OPINION
{¶ 1} Appellant-mother ("mother") appeals from a judgment of the Cuyahoga County Court of Common Pleas, Juvenile Division, granting permanent custody of mother's thirteen-month old child, D.J., to appellee, Cuyahoga County Department of Children and Family Services ("CCDCFS"). For the following reasons, we affirm the judgment of the trial court. *Page 3 
 {¶ 2} D.J. was born on June 14, 2005. On June 17, 2005, CCDCFS filed a complaint, alleging that D.J. was a dependent child, and requesting an original disposition of permanent custody of him. In the complaint, Joan Johnson ("Ms. Johnson"), social worker for CCDCFS, averred, inter alia, that mother had five children in the emergency custody of CCDCFS because of abuse allegations; mother had a significant history with CCDCFS; mother had not complied with the objectives of her case plan with respect to the other children; mother had failed to benefit from numerous services in the past seven years, specifically drug and alcohol treatment; the alleged father had a lengthy criminal history; and he had not established paternity.
 {¶ 3} On June 20, 2005, at the shelter care hearing, the juvenile court granted emergency temporary custody to CCDCFS. The court found that probable cause existed to remove D.J. pursuant to R.C. 2151.31. D.J. was placed in the same foster home as his five siblings because the court found that there were no suitable relatives to place him with at that time. Mother was given supervised visitation every other Thursday, for two hours per visit.[1] A Guardian At Litem ("GAL") was also appointed for D.J. *Page 4 
 {¶ 4} CCDCFS filed the case plan on July 13, 2005. According to the case plan, mother was to refrain from using drugs and alcohol, and continue to do random drug screens; maintain stable housing and provide basic needs; participate in and complete a psychological evaluation, and follow all recommendations; and participate in and complete a sixteen-week parenting class, and follow all recommendations. The father was also required to establish paternity.[2] Permanent custody was identified as the goal of the case plan.
 {¶ 5} The trial court held a pretrial on September 28, 2005. It was continued because all necessary parties were not present. However, Ms. Johnson informed the court that according to mother's probation officer in her criminal child endangering case, mother had "dirty urines."[3]
 {¶ 6} On October 25, 2005, CCDCFS filed a semi-annual administrative review ("SAR"). In it, Ms. Johnson reported that mother had tested positive for PCP on July 27, 2005, and tested positive for cocaine and PCP on September 7, 2005. Although Ms. Johnson stated that mother was in treatment through the probation department, mother had not provided the agency with any reports or records of *Page 5 
treatment. Although Ms. Johnson reported that "mother visits with [D.J.] every Thursday" and "mother appears to be very loving to baby and takes redirection well," she indicated that "minimal progress had been made on the case plan."
 {¶ 7} On October 27, 2005, the trial court held another pretrial hearing. However, the court continued the hearing again since discovery had not been completed. It gave the parties until November 10, 2005 to exchange discovery. Ms. Johnson informed the court that she would be amending the case plan to require mother to have another drug assessment done since she tested positive for cocaine and PCP. The case plan in effect at the time of the hearing only required that mother do random urine screens. Ms. Johnson also reported that mother had completed anger management counseling. The court found that father's whereabouts were unknown and D.J.'s "[siblings were committed to the permanent custody of the agency in September, 2005."
 {¶ 8} On January 18, 2006, at the adjudication hearing, mother stipulated to an amended complaint for dependency. The state agreed to remove allegations that mother had failed to comply with her case plan objectives, mother had been evasive with CCDCFS, and mother failed to benefit from numerous services over the years, especially with respect to drug and alcohol treatment. However, it added, "mother was referred for counseling services, but has not yet completed her counseling services." The trial court then found D.J. to be a dependent child. *Page 6 
 {¶ 9} In a SAR dated January 23, 2006, Ms. Johnson reported that mother completed parenting classes on December 29, 2005. It was also reported that mother had "good participation and attendance, and [it was] recommended that she be offered some ongoing parent support services."
 {¶ 10} Ms. Johnson further indicated that "substance abuse concerns remain," but that mother had begun the process of obtaining her GED, had been employed at McDonald's since September 2005, and had obtained housing in November 2005. Mother also still needed to address many issues through counseling, make progress with drug treatment services, and demonstrate a good period of sobriety and stability. However, there were "[n]o problems or concerns" with visitation.
 {¶ 11} Ms. Johnson concluded the January 23, 2006 SAR with the following: "[a]gency to continue PC efforts at this time. However, mom has made significant progress as she is employed FT, obtained housing 2 months ago, is due to move onto aftercare next week, is involved in counseling, and has completed parenting and anger mgt services."
 {¶ 12} On April 20, 2006, Ms. Johnson filed another updated SAR. She reported that mother tested positive for amphetamines on March 15, 2006. This was a violation of her probation, and thus, mother was in the county jail at the time the SAR was filed. Ms. Johnson also reported that she had just learned that mother had a diluted urine test in November 2005. In addition, mother was pregnant again, and was due on October 31, 2006. *Page 7 
 {¶ 13} Ms. Johnson further indicated in the April 20, 2006 SAR that mother's counselor reported that mother had not recently been to counseling. A psychological evaluation, however, was completed in February 2005. The doctor indicated that mother had a personality disorder, partner relational problems, economic difficulties, minimal support, major difficulties functioning in social and occupational settings, and difficulties with judgment and decision making. It was also reported again that mother continued to visit D.J. every week and that she had good interaction with him.
 {¶ 14} On July 13, 2006, the juvenile court held a hearing on the disposition of D.J. Ms. Johnson testified for the state. She discussed mother's history with the agency since the year 2000, as well as to mother's recurring drug and alcohol issues. Mother had her children removed from her custody more than once, but they had been returned to her custody each time until the January 2005 removal. Ms. Johnson explained that mother had been referred to several drug and alcohol treatment programs since the year 2000. She successfully completed some of them. However, CCDCFS continued to receive referrals regarding mother's substance abuse, even after she had completed the programs.
 {¶ 15} Ms. Johnson testified that five of mother's children, who had been in the custody of CCDCFS since January 2005, were placed in the permanent custody of CCDCFS on September 29, 2005. *Page 8 
 {¶ 16} Ms. Johnson stated that mother was currently in a six-month residential treatment program through Catholic Charities, called Ewason, where she had only been since June 5, 2006. Mother had been doing random drug screens in the program and all of the tests had been negative, except for one positive result for alcohol on June 29, 2006. However, Ms. Johnson stated that since mother was pregnant, her case manager at Ewason said that mother may have borderline diabetes, and thus, may have high glucose levels. Ms. Johnson further testified that mother had been visiting D.J. every Thursday, and that all visits had been "real good." She agreed that mother could provide for D.J.'s basic needs, since mother could have him at Ewason with her, which is a lockdown facility. She stated that mother had met the stable housing objective of her case plan prior to going to jail in April 2006.[4] She also reported that mother was not employed, but employment was not a stated objective on her case plan.
 {¶ 17} She also testified that D.J. had a good relationship with his foster mother, and that he was currently in the same home as his five siblings. She indicated that there were no relatives who were able and willing to take custody of D.J. She said that mother's sister had seven kids of her own and two other family *Page 9 
members initially expressed interest, but then never followed through. Further, she stated that D.J.'s foster mother planned to adopt him.
 {¶ 18} When asked why the agency was filing for permanent custody, Ms. Johnson replied, "[b]ecause the other children, the other siblings, they were abused." When asked why she thought permanent custody was in the best interest of D.J., Ms. Johnson replied:
 {¶ 19} "[Mother] has had every opportunity. She's gone through the classes, and she's been in numerous programs, and she'll do well for a while, and then she'll do something pertaining to substance abuse. Knowing she's not supposed to be doing drugs, and that's my concern that I would worry about is mom will go through the program, and then she'll do something and cause her to get back involved with [CCDCFS]."
 {¶ 20} Finally, while Ms. Johnson agreed that mother could currently provide a safe and stable environment for D.J., she was not sure what mother would do when she got out of the treatment program.
 {¶ 21} On cross-examination, Ms. Johnson admitted that she had no concerns about mother's ability to care for D.J. She further admitted that she never talked to mother about the possibility of having D.J. live with her at the residential treatment facility. *Page 10 
 {¶ 22} When cross-examined by D.J.'s GAL, Ms. Johnson stated that mother's problem was that she could not maintain sobriety, since she had been unable to conquer chemical dependency in five years. She further indicated that mother had been in jail three times since she had the case.[5]
 {¶ 23} Takisha Ruffin ("Ms. Ruffin"), mother's case manager in the Ewason Program, testified for mother. She stated that mother had been at the program since June 8, 2006. She confirmed that mother would be able to have D.J. live with her while she was in the program. In fact, being pregnant or having children is a requirement of the program. She further stated that after mother completed the program, that they would assist her with employment services and continue to monitor her in an intensive outpatient program with housing support for an additional four months. Then, mother could enter the aftercare program for another year of services.
 {¶ 24} Ms. Ruffin explained that she was not concerned about mother's positive urine test for alcohol, since pregnant mothers often test positive for alcohol. She further stated that mother was doing very well in the program, attending school and starting to participate in group therapy. *Page 11 
 {¶ 25} In a July 25, 2006 judgment, the juvenile court found that the allegations of the complaint had been proven by clear and convincing evidence. Specifically, the juvenile court found:
 {¶ 26} "* * * that a grant of permanent custody is in the best interests of the child and the child can not be placed with one of the child[']s parents within a reasonable time or should not be placed with either parent.
 {¶ 27} "The child has been in temporary custody of a public children services agency * * * under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period.
 {¶ 28} "Following the placement of the child outside the child's home * * * the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the home.
 {¶ 29} "The chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year.
 {¶ 30} "The GAL strongly recommended that Permanent Custody be granted."
 {¶ 31} The juvenile court further noted that "[t]he parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child. The Court finds *Page 12 
that the mother has relapsed and tested positive to P.C.P and Cocaine. Father has never established paternity with the child."
 {¶ 32} Finally, the court stated: "[CCDCFS] has made reasonable efforts: to prevent placement and/or to make it possible for the family to remain in or return to the home and to finalize the permanency plan for the child and family, to wit, adoption. Case specific findings on services offered and reasons why they were not successful: Following reasonable case planning and diligent efforts by the agency to reunify the family, the problems that initially caused the child to be placed outside the home have not been substantially remedied for the child to be returned to the home. During this time, the parents have not demonstrated a commitment toward the child by failing to support, visit or communicate with the child when able to do so, such the child has bonded to the relative/foster care provider."
 {¶ 33} It is from this judgment which mother appeals, raising the following sole assignment of error:
 {¶ 34} "The juvenile court committed error to the prejudice of the mother-appellant contrary to the manifest weight of the evidence when it granted CCDCFS' motion for permanent custody and committed the subject child to the permanent custody of CCDCFS."
 {¶ 35} The termination of parental rights is governed by R.C.2151.414. In re M.H., Cuyahoga App. No. 80620, 2002-Ohio-2968, at 4|22. A trial court must apply a *Page 13 
two-prong test under this statute, measured by clear and convincing evidence. Id. With respect to this court's standard of review, we stated in In re M.H.:
 {¶ 36} "`Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established. A determination of whether something has been proven by clear and convincing evidence will not be disturbed on appeal unless such determination is against the manifest weight of the evidence. If a burden of proof must be met with clear and convincing evidence, a reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy that burden of proof.'" Id., quoting In re EM. (Nov. 8, 2001), Cuyahoga App. No. 79249, 2001 Ohio App. LEXIS 5011.
 {¶ 37} Thus, we must look to the record in its entirety to determine whether the trial court had sufficient evidence to clearly and convincingly find that it was in D.J.'s best interest to place him in the permanent custody of CCDCFS and that D.J. could not be placed with either parent in a reasonable or should not have been placed within a reasonable time. After thoroughly reviewing the evidence, we conclude that it did.
 {¶ 38} In In re D.A., 113 Ohio St.3d 88, 2007-Ohio-1105, at ¶ 8, the Supreme Court of Ohio stated: *Page 14 
 {¶ 39} "[i]n Troxel v. Granville (2000), 530 U.S. 57, 65 * * *, the United States Supreme Court noted that parents' interest in the care, custody, and control of their children `is perhaps the oldest of the fundamental liberty interests recognized by this Court.' The protection of the family unit has long been a paramount concern of the courts * * *."
 {¶ 40} The Ohio Supreme Court further noted that "`(p)ermanent termination of parental rights has been described as "the family law equivalent of the death penalty in a criminal case. * * * Therefore, parents "must be afforded every procedural and substantive protection the law allows." * * *'" Id. at ¶ 10.
 {¶ 41} Parents' fundamental interest is not absolute. "Once a case reaches the disposition phase, the best interest of the child controls. The termination of parental rights should be an alternative of last resort.'" Id. at ¶ 11.
 {¶ 42} Therefore, before a natural parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. Santosky v.Kramer (1982), 455 U.S. 745, 759.
 {¶ 43} Ohio law provides for two means by which an authorized agency may seek to obtain permanent custody of a child. The agency may first obtain temporary custody and then subsequently file a motion for permanent custody, or the agency *Page 15 
may request permanent custody as part of its original abuse, neglect, or dependency complaint. See R.C. 2151.413, R.C. 2151.27(C), and R.C.2151.353(A)(4).
 {¶ 44} In order to grant permanent custody in its initial disposition, the trial court must apply a two-prong test. R.C. 2151.414(B). Specifically, the juvenile court must find, by clear and convincing evidence, that: (1) the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors enumerated in R.C. 2151.414(D); and (2) the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, pursuant to at least one of the factors listed in R.C.2151.414(E).
 {¶ 45} The first prong of the analysis, under R.C. 2151.414(D), provides that in determining the best interest of the child, "the court shall consider all relevant factors, including, but not limited to, the following:
 {¶ 46} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 47} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard to the maturity of the child;
 {¶ 48} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public service agencies * * * for twelve or more months of a consecutive twenty-two month period * * *; *Page 16 
 {¶ 49} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 50} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents of the child."
 {¶ 51} Initially, we note that the trial court erred with respect to one of its findings relating the "best interest" factors. It concluded that "[t]he child has been in the temporary custody of a public children services agency * * * under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period." The hearing was held on July 13, 2006. While D.J. had been in custody since his birth, June 14, 2005, he had not been in custody for "twelve months" as defined by the statute.
 {¶ 52} R.C. 2151.414(D) provides that "[f]or purposes of this division, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from the home." D.J. was not adjudicated a dependent child until January 18, 2006. Sixty days after he was removed from his home, which would clearly be the earlier date, would have been sixty days from June 17, 2005, which would be August 16, 2005. Twelve months from August 16, 2005 would be August 16, 2006, over one month after the *Page 17 
dispositional hearing had already taken place. Thus, the trial court incorrectly found this best interest factor under R.C. 2151.414(D)(3).
 {¶ 53} Nevertheless, after reviewing the evidence, we conclude there is sufficient, additional evidence to support the juvenile court's determination, clearly and convincingly, that it was in D.J.'s best interest to be placed in the permanent custody of CCDCFS. R.C.2151.414(D) does not require the juvenile court to find that each best interest factor applies, only that it consider each one.
 {¶ 54} With respect to the best interest factors, the trial court stated in its judgment entry that it considered all of the factors, but explicitly only found one of them (not including the incorrect one we previously noted). Specifically, the trial court found that the GAL strongly recommended that permanent custody be granted.[6] This court has "consistently held that only one of the factors set forth in R.C.2151.414(D) needs to be resolved in favor of the award of permanent custody in order for the court to terminate parental rights." In reZ.T., Cuyahoga App. No. 88009, 2007-Ohio-827, at 4|56.
 {¶ 55} Despite the trial court not making an explicit finding with respect to the best interest factor, interaction and interrelationship of the child to those who *Page 18 
significantly affect him, there was evidence presented to show that mother and the foster mother had a good relationship with D.J. There was also evidence presented that the foster mother planned to adopt D.J. and that he had a good relationship with his siblings, who were placed in the same foster home.
 {¶ 56} Mother argues that because she regularly visited D.J. and her visits were "good," that it was not in D.J.'s best interest to be placed in CCDCFS's permanent custody. However, that is not the only factor a court must consider. In addition, the statute does not require a court to weigh a mother's bond more heavily than the other best interest factors.
 {¶ 57} CCDCFS does not deny that D.J. was bonded to mother. CCDCFS raises safety concerns regarding mother's ongoing substance abuse issues and whether mother would be able to provide a secure permanent placement. Mother even concedes in her brief that she still has substance abuse issues. She states that "except for [her] drug rehabilitation, [she] did satisfy most of her case plan requirements."
 {¶ 58} The record shows that while this case was pending, mother relapsed several times. D.J. was born on June 14, 2005 and immediately removed from mother's custody. A case plan, requiring mother to remain drug free, was filed on July 13, 2005. Even if we do not consider the possible "false-postive" test for alcohol on June 29, 2006, it is clear that mother did not remain drug free as required. *Page 19 
 {¶ 59} Ms. Johnson testified that mother tested positive for PCP and cocaine in July 2005 and positive for PCP in September 7, 2005. In addition, Ms. Johnson stated that mother tested positive for amphetamines in April 2006, violating her probation, and causing her to spend time in jail.[7]
 {¶ 60} Ms. Johnson further explained that mother was referred to a drug treatment program in 2005, Recovery Resources, which she completed, as well as the aftercare program.[8] However, Ms. Johnson then explained that mother was referred to another drug assessment treatment program through the probation department, but then she relapsed in July and September 2005. She explained that as a result of mother's probation violation in March 2006, and subsequent to her jail time, mother entered Ewason, where she had only been for a little over a month at the time of the dispositional hearing.
 {¶ 61} In In re M.H., supra, a case similar to the one at bar, this court stated, "[n]oncompliance with a parent's case plan is a ground for termination of parental rights." Id. at 4|34, citing In re Brofford
(1992), 83 Ohio App.3d 869, 878. We reasoned: "[a]nd even though mother had been drug-free for the six months *Page 20 
preceding trial, her erratic history of drug-use and her unsuccessful attempts at so many other drug treatment programs does not leave this court convinced of mother's ability to remedy her drug dependency, on a long-term basis. * * * At the time of trial, mother was on probation for an offense which she admits was related to her drug use. * * * This court is not persuaded that mother can accomplish [taking care of her daughter] in light of evidence that mother has done little to make a better life for herself, let alone her daughter. On the record before us, there was clear and convincing evidence indicating there was little likelihood mother could provide the care M.H. requires."
 {¶ 62} The record does show that mother completed anger management and parenting classes. There was also evidence that mother was able to comply with her housing objective and evidence that she was employed for a time. However, she then went to jail for a probation violation after she tested positive for amphetamines in March 2006. It was unclear at trial what happened to her housing, but she was obviously no longer employed.
 {¶ 63} Therefore, as to the first prong of the analysis, we conclude that there was sufficient evidence to clearly and convincingly show that it was in D.J.'s best interest to be placed in the permanent custody of CCDCFS. *Page 21 
 {¶ 64} The second prong of the test under R.C. 2151.414(E) sets forth sixteen factors that the trial court must consider in determining "whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents[.]" Under this statute, a trial court need only find one of these factors, by clear and convincing evidence, in order to award permanent custody to an authorized agency. The trial court only made findings as to the following three R.C. 2151.414(E) factors:
 {¶ 65} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency * * * the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. * * *;
 {¶ 66} "(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing;
 {¶ 67} "* * *
 {¶ 68} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to *Page 22 
do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child. * * *"[9]
 {¶ 69} Regarding the first finding, the record clearly supports it. There was testimony presented that the mother relapsed several times throughout the duration of the case. Again, she tested positive for PCP in July 2005, for PCP and cocaine in September 2005, and for amphetamines in March of 2006, all after she had completed Recovery Resources, a drug treatment program. Thus, mother failed continuously to remedy her drug abuse problem, despite treatment and the efforts of CCDCFS to help her.
 {¶ 70} The record also supports the trial court's second and third findings, although we point out that the trial court merely restated that statute, rather than make specific findings regarding mother's case.[10] There was evidence presented that mother's chemical dependency was so severe that she was unable to provide an adequate permanent home for D.J. However, no evidence was presented as to the other illnesses or disabilities. *Page 23 
 {¶ 71} In addition, there was evidence presented that mother did not financially support D.J. However, there was substantial evidence that she visited him every Thursday, for two hours at a time, throughout the duration of her case (except when she went to jail for violating her probation), and that her relationship with him was good.
 {¶ 72} Moreover, if a court finds, as a matter of fact, that any one of the factors set forth in R.C. 2951.414(E) exist, it "shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent * * *." (Emphasis added.) Thus, the determination itself is mandatory. See In reM.W., 8th Dist. No. 83390, 2005-Ohio-1302.
 {¶ 73} We do note that the trial did not make two important R.C.2151.414(E)(7) and (11) findings based on the evidence presented at trial. Although a trial court need only find one of the sixteen R.C.2151.414(E) factors in order to find that a child cannot be placed with a parent in a reasonable time or should not be placed with a parent, the factors listed under R.C. 2151.414(E)(7) to (E)(11) also specifically support a finding that it would be in D.J.'s best interest to be placed in CCDCFS permanent custody. See R.C. 2151.414(D)(5) (best interest factors).
 {¶ 74} These two factors are hard to overlook. There was testimony presented that mother had been convicted of child endangering against two of her five children, D.J.'s siblings, who were removed from her custody in January 2005 (R.C. 2151.414(E)(7)(c)). In addition, Ms. Johnson testified that all five of these children *Page 24 
were placed in the permanent custody of CCDCFS in September 2005 (R.C.2151.414(E)(11)).
 {¶ 75} The trial court did not err by omitting these findings. However, when terminating parental rights, the better practice would be for a trial court to make findings as to every significant factor. This is especially pertinent, considering that the best interest provision specifically provides that "the court shall consider all relevant factors, including, but not limited to," the ones enumerated in R.C.2151.414(D).
 {¶ 76} Despite the trial court's omission, and after reviewing the record, we conclude that sufficient evidence was presented for the trial court to find under a clear and convincing standard, that it was in D.J.'s best interest to be placed in the permanent custody of CCDCFS, and that he could not be placed with either parent in a reasonable time or should not be placed with either parent.
 {¶ 77} Accordingly, appellant's sole assignment of error lacks merit. The judgment of the Juvenile Division of the Cuyahoga County Court of Common Pleas is affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution. *Page 25 
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANTHONY O. CALABRESE, JR., P.J. and PATRICIA A. BLACKMON, J., CONCUR
[1] Although mother was given supervised visitation every other Thursday, throughout the remaining file and hearings, it was reported that mother actually had visits every Thursday, for two hours.
[2] The father was required to complete a number of other objectives. However, the father's case plan performance is not pertinent to this appeal.
[3] Mother's criminal child endangering case arose from the same set of facts which facilitated the removal of mother's five children in January 2005. It was alleged that mother was hitting two of the children with an extension cord. Ms. Johnson stated that one of the children had marks on his arm, stomach, and back. The other had marks on her arm and right thigh. Mother was convicted of child endangering in September 2005, and was placed on probation for two years.
[4] Ms. Johnson also stated that she did not know if mother was able to retain her Section 8 housing after she went to jail. Plus, mother had then entered a residential treatment facility for six months when she was released from jail. Thus, Ms. Johnson was not sure if mother would be able to obtain stable housing after she was released from Ewason.
[5] It is not clear from the testimony if mother had been incarcerated three times since 2000 (since Ms. Johnson had testified that she had been on the case since 2000), or three times since the current case had been opened in January 2005. D.J. was added to the January 2005 case when he was born.
[6] The GAL did not testify at the dispositional hearing. His report is included in the record on appeal.
The trial court did not make any best interest findings regarding the interaction and interrelationship of the child to those who significantly affect him, the child's need for a legally secure placement, or whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply (which two of them do, as discussed later in the opinion).
[7] We note that the record on appeal contradicts mother's testimony with respect to the actual dates. Previous hearings and the written SAR reports show that mother tested positive only for PCP in July 2005 and positive for cocaine and PCP in September 2005. In addition, the record shows that mother tested positive for amphetamines in March 2006. However, for the purpose of proving the fact that mother relapsed, these errors are irrelevant. Mother obviously relapsed several times throughout her case and during the short life of the infant child.
[8] Ms. Johnson did not say when in 2005 mother was referred to Recovery Resources, or when she completed it.
[9] There were other factors under R.C. 2151.414(E)(7) to (11) that apply to the instant case, which the trial court did not find, despite the evidence presented, (E)(7), the parent was convicted of child endangering against a sibling, and (E)(11), the parent has had parental rights involuntarily terminated with respect to a sibling.
[10] Although the trial court did not err when it simply recited the boilerplate language of the permanent custody statute, considering the seriousness and permanency of these cases, it would be prudent for trial courts to make specific findings regarding the mother's actual case. *Page 1