[Cite as *In re J.M-R.*, 2013-Ohio-1560.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 98902**

# IN RE:   J.M-R.
# Minor Child

[Appeal By T.M., Mother]

## JUDGMENT:
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD 11919533

**BEFORE:**   Boyle, P.J., Rocco, J., and Keough, J.

**RELEASED AND JOURNALIZED:**    April 18, 2013

**ATTORNEY FOR APPELLANT**

Timothy R. Sterkel
1414 South Green Road
Suite 310
South Euclid, Ohio   44121


**ATTORNEYS FOR APPELLEES**

**For Cuyahoga County Department of Children and Family Services**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Mark Adelstein
Assistant Prosecuting Attorney
8111 Quincy Avenue
Room 450
Cleveland, Ohio 44104

**For D.R.**

Jay L. Mattes
4699 Azalea Lane
North Olmsted, Ohio   44070

**Guardian Ad Litem for Child**

Melinda J. Annandale
20033 Detroit Road
Annex F1-1
Rocky River, Ohio   44116

**Guardian Ad Litem for Mother**

Amy L. Habinski
526 Superior Avenue
Suite 1255
Cleveland, Ohio   44114

MARY J. BOYLE, P.J.:

{¶1}   Appellant-mother, T.M.[1] ("mother"), appeals the juvenile court's judgment granting permanent custody of her minor child, J.M-R. (d.o.b. November 3, 2011), to Cuyahoga County Department of Children and Family Services ("CCDCFS" or "the agency").   She raises three assignments of error for our review:

> 1. The trial court committed error when it proceeded with the permanent custody hearing without complying with 25 U.S.C. 1912.
>
> 2. The trial court committed error when it terminated appellant's parental rights and granted permanent custody to CCDCFS.
>
> 3. Appellant was denied effective assistance of counsel.

{¶2}   Finding no merit to her appeal, we affirm.

### Procedural History and Factual Background

{¶3}   On November 4, 2011, CCDCFS filed a complaint alleging that J.M-R. was a dependent child and requesting a disposition of permanent custody.   After a hearing on CCDCFS's motion, the agency was granted predispositional temporary custody of J.M-R.  The court appointed a guardian ad litem for mother and a guardian ad litem for J.M-R.

{¶4}   On March 12, 2012, mother filed a motion for legal custody, requesting that she be granted legal custody of J.M-R., or in the alternative, that legal custody be granted to the maternal grandmother, M.M., or the child's cousin, N.M.

---

[1]The parties are referred to by their initials or title in accordance with this court's established policy regarding non-disclosure of identities in juvenile cases.

**{¶5}** On March 20, 2012, the child's guardian ad litem, Melinda Annandale, submitted a report to the court stating that it was her opinion that it was in the child's best interest to be placed in the permanent custody of CCDCFS. Annandale explained that she had been involved with mother since August 14, 2009. She was the guardian ad litem for mother's other two children who had been permanently removed from mother and father. She stated that the alleged father "has never made an appearance nor made his whereabouts known to me." She stated that mother was cooperative and expressed her desire to rear her children, but that she had been diagnosed with learning disabilities and limited intellectual capabilities. Annandale opined that reunification would require significant support from other adults, but that there was no suitable person available. Annandale further stated that no relative was suitable for placement. According to Annandale, father had not engaged in any case plan services. Mother had made attempts, but had not, or could not, follow through. She explained that mother did complete a parenting class, but failed to benefit from it. Further, mother has had multiple opportunities to establish her own residence to provide basic needs, but "it just never happens." Since the case had not been tried, Annandale reserved the right to change her recommendation.

**{¶6}** On June 20, 2012, mother and alleged father, D.R., admitted to an amended complaint alleging dependency, including (1) mother and alleged father had two children permanently removed from their care due to physical abuse of one of the children and both were placed in permanent custody in July 2011; (2) mother and alleged father had a

domestically violent relationship, and mother needs domestic violence services; (3) mother has developmental delays; (4) mother had independent supportive housing for herself and resides with alleged father; (5) mother engaged in parenting classes and needs to re-engage; (6) alleged father needs to engage in parenting classes; (7) alleged father needs substance abuse treatment; and (8) alleged father needs to visit child and has attempted to establish paternity. Subsequently, the court adjudicated J.M-R. to be a dependent child.

{¶7} The court held a permanent custody hearing on July 31, 2012. Present at the hearing were mother, mother's counsel, mother's guardian ad litem, the guardian ad litem for J.M-R., counsel for CCDCFS, and Michelene Willis, the CCDCFS social worker assigned to the case.

{¶8} Willis testified that she got involved with mother and father when the agency obtained emergency custody of their two older children, born November 14, 2008 and January 4, 2010, after the oldest child suffered multiple leg fractures when he was in father's care. The leg fractures were at different stages of healing when Willis was assigned to the case. This oldest child also had other injuries, including bruising on his face and a burn on his thumb. Willis testified that the agency received permanent custody of these children in June 2011. CCDCFS became involved with J.M-R. because mother became pregnant with him while she still had an active case with the agency. Because neither mother nor father had completed their case plans for the other children, the agency removed J.M-R. from mother and father at birth.

**{¶9}** Regarding J.M-R., Willis testified that mother's case plan for all three children included a mental health component. Mother did not comply with this part of her case plan with the other two children or with J.M-R. Willis explained that mother had a psychological evaluation through the court clinic. It found that mother has borderline intellectual capabilities. Mother was referred for mental health counseling. This counselor was assigned to not only assist mother with mental health counseling, but also to assist mother with all of the other components of her case plan. Although mother initially went to her appointments, she stopped going.

**{¶10}** Regarding mother's parenting component of her case plan, Willis testified that mother attended 15 of 18 parenting classes at the YWCA and did not receive her certificate. Mother was subsequently referred to two other parenting classes through Beech Brook and Carl Stokes, but she did not complete either of those programs.

**{¶11}** Willis testified that mother was supposed to receive domestic violence services as part of her case plan. Mother was referred to the YWCA for its seven-week domestic violence program. Although mother attended "the seven classes," she did not obtain a certificate because she failed to complete the final phase of the program that included her preparing a safety plan and giving it to the instructor.

**{¶12}** According to Willis, mother and father lived together in a two-bedroom house. Mother and father admitted to a domestic violence history that included pushing each other. Father admitted to putting "his hands on" mother in the past. Father never completed a domestic violence program. Although Willis agreed that there had not been

any domestic violence in their home since father had moved in, Willis explained that there were safety concerns because mother still lived with father.

{¶13} Willis further testified that mother never obtained a stable job, which was part of her case plan.

{¶14} Willis testified that father never completed any of his case plan. He had not established paternity. He did have a substance abuse assessment, but never followed through with the recommendations. Father never submitted to any random drug tests, although he admitted to smoking marijuana. Father never completed domestic violence classes, parenting classes, or provided proof of a stable income. Willis also stated that since the agency had obtained emergency custody of J.M-R., father had only visited him three times.

{¶15} Willis did not know definitively how many times mother had visited J.M-R., but said that mother visited him about once a month. Willis transports J.M-R. to each visit with mother and supervises the visits. Willis said that the majority of the time J.M-R. cries the "entire visit."

{¶16} Willis testified that J.M-R. was placed in a foster-to-adopt home. She stated that J.M-R. was doing well and was "developmentally on target." According to Willis, J.M-R. is very bonded to his foster family and his extended foster family. When Willis takes him back to the foster home, he is "excited to be back home and he calms down."

**{¶17}** Willis testified that the agency investigated relatives to take custody of J.M-R. She stated that a paternal aunt's home study was denied due to drug-related convictions. A maternal cousin was rejected due to a 2004 felony burglary conviction, plus she had a prior history with CCDCFS and Lorain County children services, with a substantiated sexual abuse allegation. The maternal grandmother was also investigated. Willis testified that at first the grandmother told her a few months before the permanent custody hearing that she did not want custody of J.M-R. because "she wanted to get her life together." Willis said that the maternal grandmother still had two minor children in her custody, out of six or seven children. The maternal grandmother had a history with CCDCFS, including seven or eight referrals, with four being substantiated or indicated. Grandmother did visit with J.M-R. approximately 40 percent of the time, but according to Willis, J.M-R. was not bonded to the grandmother. The grandmother also had a prior drug trafficking conviction.

**{¶18}** Mother had several witnesses testify against permanent custody. The maternal grandmother testified that she had been visiting J.M-R. since he was born. She testified that she wanted legal custody of him. She stated that she had not had a drug trafficking conviction since 1991. She had seven children, two still at home. Mother was actually born while she was in prison for her drug trafficking conviction. While grandmother was in prison, her other children were in the custody of their father, but she said they were never removed from her custody.

{¶19} The maternal cousin testified that she visited J.M-R. when he was born. She testified that she even took her daughters to visit him one time. The last time she visited him was at Christmas in 2011. She stated that she had asked to visit with him again, but the visitation schedule conflicted with her children's schedules. She testified that she was never incarcerated for her convictions; she only served two months of probation. She further testified that her children were never removed from her custody. She said that in preparation for obtaining custody of other children, she attended foster care parenting classes and received a certificate in March 2011, but Willis told her it was only good for one year. The maternal cousin testified that she was taking the classes again to obtain a new certificate. The maternal cousin further explained that she receives SSI because she was born with spinal meningitis that left her with cerebral palsy on the right side of her body.

{¶20} On cross-examination, the maternal cousin agreed that she never completed a home study to have foster children live with her.

{¶21} Annandale, the child's guardian ad litem, testified that after she heard all of the evidence, her recommendation remained the same, i.e., that CCDCFS receive permanent custody of J.M-R. On cross-examination, Annandale testified that the maternal grandmother did not want custody of J.M-R. until Annandale told her that she could receive money from the state for having custody of him.

{¶22} After hearing all of the evidence, the trial court granted CCDCFS's motion for permanent custody.

**{¶23}** Mother's assignments of error will be addressed out of order for ease of discussion.

Permanent Custody Determination

**{¶24}** In her second assignment of error, mother argues that the trial court erred when it granted CCDCFS's motion for permanent custody.

**{¶25}** An agency may obtain permanent custody of a child in two ways. *In re E.P.,* 12th Dist. Nos. CA2009-11-022 and CA2009-11-023, 2010-Ohio-2761, ¶ 22. An agency may first obtain temporary custody of the child and then file a motion for permanent custody. *See* R.C. 2151.413. Or, an agency may request permanent custody as part of its original abuse, neglect, or dependency complaint, which is what the agency did in the present case. *See* R.C. 2151.27(C) and 2151.353(A)(4).

**{¶26}** The termination of parental rights is governed by R.C. 2151.414. *In re M.H.*, 8th Dist. No. 80620, 2002-Ohio-2968, ¶ 22. A trial court must apply a two-prong test under this statute, measured by clear and convincing evidence. *Id.* R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency. The statute requires the court to find, by clear and convincing evidence, that (1) granting permanent custody of the child to the agency is in the best interest of the child under R.C. 2151.414(D), and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the

child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive 22-month period. R.C. 2151.414(B)(1).

{¶27} Clear and convincing evidence is

> that measure or degree of proof which is more than a mere "preponderance of the evidence" but not to the extent of such certainty required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.

*In re Awkal*, 95 Ohio App.3d 309, 642 N.E.2d 424 (8th Dist.1994), fn. 2, citing *Lansdowne v. Beacon Journal Publishing Co.*, 32 Ohio St.3d 176, 512 N.E.2d 979 (1987).

{¶28} "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re Jacobs*, 11th Dist. No. 99-G-2231, 2000 Ohio App. LEXIS 3859, *11 (Aug. 25, 2000), citing *In re Taylor* 11th Dist. No. 97-A-0046, 1999 Ohio App. LEXIS 2620 (June 11, 1999).

A. *First Prong: Placement With Either Parent*

{¶29} The trial court's determination of whether the child cannot or should not be placed with either parent is guided by R.C. 2151.414(E). This section sets forth 16 factors that the trial court may consider in its determination. It provides that if the trial court finds by clear and convincing evidence that any of the 16 factors exists, the court

must enter a finding that the child cannot or should not be placed with either parent within a reasonable period of time. *In re D.J.*, 8th Dist. No. 88646, 2007-Ohio-1974, _ 64.

{¶30} Relevant to this section, the trial court made the following findings:

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. [R.C. 2151.414(E)(1)]

The chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parents unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year from the time the court holds the hearing. [R.C. 2151.414(E)(2)]

The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child. [R.C. 2151.414(E)(4)]

The father has abandoned the child. [R.C. 2151.414(E)(10)]

The parent has had parental rights terminated with respect to a sibling of the child and the parent has failed to provide clear and convincing evidence to prove, that notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child. [R.C. 2151.414(E)(11)]

{¶31} One of the 16 factors would have been sufficient. *In re M.W.*, 8th Dist. No. 91539, 2009-Ohio-121, ¶ 49. It is undisputed that mother had two previous children involuntarily removed from her custody. This factor alone would have supported the trial court's finding that J.M-R. could not or should not be returned to mother within a reasonable period of time. *Id.*

**{¶32}** But the record also shows that while mother was attempting to make progress toward her case plan, she had not completed any of the components of it. She had stopped going to her mental health counselor, who was not only helping her with various counseling issues, but was there to help her understand and complete the other aspects of her case plan. Mother failed to complete the requirements of her parenting and domestic violence classes. Although she obtained a stable residence, she had not obtained a safe residence because she still allowed father to live with her. Father had not completed any of his case plan, especially relating to domestic violence, substance abuse, and anger management issues. Evidence also established that mother had not obtained stable employment.

**{¶33}** Further, the trial court heard evidence that mother had borderline intellectual capacity. Without support, mother would not be able to care for J.M-R. by herself. According to J.M-R.'s guardian ad litem, there was no person suitable to assist mother in caring for J.M-R.

**{¶34}** Mother argues that Willis acknowledged that mother needed "specialized classes" because of her disability. Mother contends that Willis further admitted that she sent mother to parenting and domestic service classes that were not "specialized classes." Because of this, mother contends that the agency ignored mother's needs. We disagree. Willis testified that mother's mental health counselor was set up to assist mother in all aspects of her case plan, but that mother stopped going to her mental health appointments.

**{¶35}** In light of the evidence presented at trial, we conclude that the trial court did not err in determining that notwithstanding reasonable efforts by CCDCFS to reunite J.M-R. with mother, J.M-R. cannot and should not be placed with either parent within a reasonable time.

*B. Second Prong: Best Interest Determination*

**{¶36}** When determining whether a grant of permanent custody is in the children's best interest, the juvenile court must consider the following factors under R.C. 2151.414(D)(1):

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) apply in relation to the parents and child.

**{¶37}** This court has "consistently held that only one of the factors set forth in R.C. 2151.414(D) needs to be resolved in favor of the award of permanent custody in order for the court to terminate parental rights." *In re Z.T.*, 8th Dist. No. 88009, 2007-Ohio-827, ¶ 56.

**{¶38}** The trial court found that placement with a relative was not in J.M-R.'s best interest. It further found that it would be contrary to J.M-R.'s best interest to be returned to mother. It noted that the mother had another child, a sibling, removed from her permanently. It further concluded that the agency provided relevant services to mother, but that those services were not successful in assisting mother to complete her case plan.

**{¶39}** After reviewing the record, we conclude that the trial court had sufficient competent credible evidence before it to find that it was in J.M-R.'s best interest to be placed in permanent custody. CCDCFS presented evidence at the permanent custody hearing establishing that J.M-R. had a very strong bond with his foster family, that he was doing well and was developmentally "on target." J.M-R. was not old enough to express his own wishes, but his guardian ad litem recommended it was in his best interest to be placed in the permanent custody of CCDCFS.

**{¶40}** Further, evidence was presented to establish that J.M-R.'s need for a legally secure permanent placement could not be achieved without a grant of permanent custody. Neither parent had completed any aspect of their case plan — even before J.M-R. was born with respect to the other two children. Notably, even after they received a new case plan for J.M-R., they were not able to complete the new case plan either.

**{¶41}** The court also heard evidence that mother chose to allow father to live with her. Mother and father both admitted that their relationship had been violent. But even more significant, father had severely abused their oldest child, which resulted in mother and father permanently losing custody of both of their older children. Mother still chose

to live with father, without father addressing any of his issues relating to child abuse and domestic violence.

**{¶42}** Finally, the fact that mother and father had two other children (siblings of J.M-R.) who had been placed in the permanent custody of CCDCFS is another factor a court can consider when determining what is in the child's best interest. R.C. 2151.414(D)(1)(e) (whether any of the factors in (E)(7) to (11) apply; other children being placed in the permanent custody of the agency is (E)(11)).

**{¶43}** Mother argues that she was "clearly * * * progressing toward reunification with her child." She maintains that she had continually visited her child, obtained housing, and completed various classes that she was asked to attend. Mother contends that based on this evidence, "the best interest of the child was not served in terminating" her rights.

**{¶44}** While mother may be correct that the evidence shows that she was attempting to complete the requirements of her case plan, it also shows that mother had not completed many aspects of her case plan. Most notably, mother stopped going to her mental health counselor, who was the one person who could have assisted mother in completing the other aspects of her case plan. Further, mother continued to live with father despite the fact that he had not completed any aspect of his case plan.

**{¶45}** Accordingly, after reviewing the record, we conclude it supports the trial court's finding that it was in J.M-R.'s best interest to be placed in the permanent custody of CCDCFS.

**{¶46}** Mother's second assignment of error is overruled.

Indian Child Welfare Act

**{¶47}** In her first assignment of error, mother claims that the trial court erred when it proceeded with the permanent custody hearing without complying with the Indian Child Welfare Act ("ICWA").

**{¶48}** The ICWA provides certain procedural safeguards in child custody proceedings when the subject child is an Indian child, as defined in 25 U.S.C. 1903. The ICWA was enacted due to the increasing concern over the large number of Native American children who were being placed in non-Native American foster or adoptive homes. *See* 25 U.S.C. 1901(4). The ICWA provides, in part:

> [I]t is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture[.]

25 U.S.C. 1902. Subchapter 1 of the ICWA is applicable to this case because it addresses child custody proceedings and proceedings that terminate parental rights. *In re Sanchez*, 11th Dist. No. 98-T-0104, 1999 Ohio App. LEXIS 5940 (Dec. 10, 1999).

**{¶49}** A tribe has exclusive jurisdiction over child custody proceedings in situations in which the Native American child resides or is domiciled within its reservation. 25 U.S.C. 1911(a). However, when a subject child does not reside on a reservation, child custody proceedings may be initiated in a state court. 25 U.S.C. 1911(b). In these situations, the state court, "in the absence of good cause to the

contrary, shall transfer such proceeding to the jurisdiction of the tribe." *Id*. Notice must be given to the tribe "in any involuntary [child custody] proceeding in a state court, where the court knows or has reason to know that an Indian child is involved[.]" 25 U.S.C. 1912(a).

**{¶50}** In order for any of the provisions of the ICWA to apply, the court must first determine that the child is an "Indian child" as defined in the ICWA. *See* 25 U.S.C. 1912(a); *In re J.D.B.*, 584 N.W.2d 577, 582 (Iowa App.1998). An Indian child is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" 25 U.S.C. 1903(4). The burden rests on the party who asserts the applicability of the ICWA to prove that the child meets the definition. *In re Jordan*, 9th Dist. Nos. 20773 and 20786, 2002 Ohio App. LEXIS 271, *22 (Jan. 30, 2002), citing *In re J.D.B.*, 584 N.W.2d 577, 582, and *Hofmann v. Anderson*, 176 Ore. 311, 315, 31 P.3d 510 (2001).

**{¶51}** In this case, mother had the burden to prove that the children met the statutory criteria required for the ICWA to apply. Mother asserts in her brief that "the parents of the minor child are in the best position to inform the court as to whether or not their minor child is an Indian child." The record is clear that mother never notified the trial court orally or in writing that J.R.-M. had Native American heritage, nor did she request a transfer to a tribal court. Accordingly, we overrule mother's first assignment of error.

Ineffective Assistance of Counsel

**{¶52}** In her third assignment of error, mother contends that her trial counsel was ineffective because her counsel "allowed her to enter a plea to the amended dependency complaint knowing the state was seeking permanent custody of her child."

**{¶53}** The right to counsel, guaranteed in permanent custody proceedings by R.C. 2151.352 and Juv.R. 4, includes the right to the effective assistance of counsel. *In re Wingo*, 143 Ohio App.3d 652, 666, 758 N.E.2d 780 (4th Dist.2001), citing *In re Heston*, 129 Ohio App.3d 825, 827, 719 N.E.2d 93 (1st Dist.1998). "'Where the proceeding contemplates the loss of parents' 'essential' and 'basic' civil rights to raise their children, * * * the test for ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking to force the permanent, involuntary termination of parental custody.'" *Id.*, quoting *Heston*.

**{¶54}** To reverse a trial court's judgment based upon a claim of ineffective assistance, a defendant must show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Noling*, 98 Ohio St.3d 44, 65, 2002-Ohio-7044, 781 N.E.2d 88; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Both prongs of this test need not be analyzed, however, if a claim can be resolved under one prong. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000); *State v. Loza*, 71 Ohio St.3d 61, 83, 641 N.E.2d 1082 (1994).

**{¶55}** As mother states, "[t]rial counsel knew, or at the very least, should have known, that factor 2151.414(E)(11) existed and that the court would find that the child could not be placed with either parent within a reasonable time." Indeed, the agency requested that permanent custody be granted in their initial complaint. So we agree that her counsel knew that factor R.C. 2151.414(E)(11) existed (that mother had two other children permanently removed from her custody). But we find that mother's counsel's performance was not deficient, nor do we find any prejudice. The state presented evidence that mother had two other children permanently removed from her custody by certified journal entry and the testimony of Willis at both the adjudication hearing and the permanent custody hearing.

**{¶56}** Accordingly, mother's third assignment of error is overruled.

**{¶57}** Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


MARY J. BOYLE, PRESIDING JUDGE

KENNETH A. ROCCO, J., and
KATHLEEN ANN KEOUGH, J., CONCUR