[Cite as *In re C.P.*, 2014-Ohio-117.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99905**

# IN RE: C.P., JR.
# A Minor Child

[Appeal by V.W., Mother ]

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD 11901412

**BEFORE:** Jones, P.J., Blackmon, J., and McCormack, J.

**RELEASED AND JOURNALIZED:** January 16, 2014

**ATTORNEY FOR APPELLANT**

Christopher Lenahan
13001 Athens Avenue, #200
Lakewood, Ohio 44107


**ATTORNEYS FOR APPELLEES**

**For C.C.D.C.F.S.**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:   Mark Adelstein
Assistant County Prosecutor
9300 Quincy Avenue
Cleveland, Ohio 44106

**Guardian Ad Litem for Child**

Mark Witt
6209 Barton Road
North Olmsted, Ohio 44070

**Guardian Ad Litem for Mother**

Carla Golubovic
P.O. Box 29127
Parma, Ohio 44129

**For C.P., Father**

Michael S. Weiss
602 Rockefeller Building
614 Superior Avenue
Cleveland, Ohio 44113

LARRY A. JONES, SR., P.J.:

**{¶1}** Mother-appellant seeks review of the trial court's April 2013 judgment terminating her parental rights and granting appellee, the Cuyahoga County Department of Children and Family Services ("CCDCFS" or the "Agency"), permanent custody of her minor son, C.P., Jr. ("C.P."). For the reasons that follow, we affirm.

## I. Procedural History

**{¶2}** C.P. was born on January 24, 2011. Two days later, on January 26, the Agency filed a complaint alleging C.P. to be dependent and requesting permanent custody of him. The complaint alleged in part that Mother had seven other children who had been removed from her care and adjudicated neglected and dependent. The complaint further alleged that of those other children, Mother's parental rights had been terminated as to four of them.[1] CCDCFS sought pre-dispositional temporary custody of C.P.

**{¶3}** Mother filed a motion seeking to grant legal custody of C.P. to a relative and a motion for pre-dispositional temporary emergency custody. After a hearing on January 28, 2011, the trial court denied the Agency's motion for pre-dispositional temporary custody of C.P., and granted Mother's motion for pre-dispositional emergency temporary custody; temporary custody of C.P. was granted to a paternal aunt.

**{¶4}** On January 31, 2011, the Agency filed a motion to set aside the judgment granting Mother's pre-dispositional emergency temporary custody motion and a motion to

---

[1] The parental rights of C.P.'s Father were also terminated; he has not appealed. Father is also father to three of C.P.'s siblings, and his parental rights were terminated as to those children as well.

stay execution of the judgment. On February 11, 2011, the trial court granted the motion to set aside the judgment, terminating the paternal aunt's temporary emergency custody of C.P., and granting pre-dispositional temporary custody of him to the Agency.

{¶5} In July 2011, C.P. was adjudicated to be a dependent child and committed to the temporary custody of CCDCFS. In April 2012, the Agency filed a motion to modify temporary custody to permanent custody.

{¶6} Because of Mother's and Father's involuntary terminations of parental rights relative to their other children, the Agency filed a motion for determination that reasonable efforts for reunification were not required. The trial court granted the motion.

{¶7} Hearings were held in February 2013 on CCDCFS's motion for permanent custody. In April 2013, the trial court issued its judgment terminating Mother's and Father's parental rights and granting permanent custody of C.P. to CCDCFS for the purpose of adoption.

## II. Facts

**The Agency's Case**

{¶8} C.P. was born on January 24, 2011. C.P. was diagnosed with cerebral palsy, developmental disorders, and dysphagia, a condition that makes it difficult for him to swallow.

{¶9} At the time of C.P.'s birth, Mother had seven other children and her parental rights had been terminated as to four of them.[2] Both Mother and Father are hearing impaired, and there is some evidence in the record that Mother has visual impairments as well.

{¶10} Mother had a history with CCDCFS. Because of Mother's prior involvement with the Agency, the Agency sought, and the trial court granted, a determination that it was not required to use reasonable efforts to reunify C.P. and Mother. The relevant background of Mother's prior involvement with the Agency is as follows.

{¶11} In 2007, with Mother's children still in her care, the Agency referred Mother for services to address concerns regarding getting her children to school and general neglect issues around her home. The social worker on the case at the time, Jamessa Motley, testified that Mother did not benefit from the services provided to her. For example, Motley was concerned that Mother was not adequately providing food for the children. After getting food for Mother on one occasion, Motley saw the food in the cat's bowl.

{¶12} Another example of general neglect that Motley testified to concerned the disconnection of gas services to Mother's home because of default in payment. The Agency worked to get the gas turned back on, but according to Motley, Mother was not very cooperative in working with her to make it happen.

---

[2]The other three children did not reside with her.

{¶13} In 2008, a domestic violence incident occurred between Mother and Father, during which Mother, who was pregnant at the time, threatened to stab herself in the stomach. Because of the domestic violence incident, the Agency believed Father posed a risk to the children and told Mother that she needed to either live with her children without Father, or live alone with Father. Mother chose to live with Father, and her children were removed from her care.

{¶14} Thus, in 2008, in addition to the concerns identified in 2007, the Agency also had concerns relative to domestic violence, Mother's mental health, and Mother's use of alcohol. CCDCFS offered services to Mother to help her address these areas of concern. According to Motley, Mother did not benefit from the services. For example, although Mother completed a parenting class, she made minimal progress. Mother took another parenting class in 2009, but, again, according to Motley, she made minimal progress. Mother attended a third parenting class in late 2009.

{¶15} Also in 2009, the Agency referred Mother for a domestic violence program. Motley testified that Mother failed to complete the program, and was referred for another domestic violence program for the deaf, which she completed. However, in 2010, Mother and Father were involved in another violent altercation.

{¶16} During the course of this custody proceeding, Mother had supervised visits with C.P. The visits initially occurred at maternal grandmother's house. The foster mother would provide C.P.'s food for the visit because C.P. was on a special diet due to his difficulty swallowing. The need for Mother to adhere to the special diet was

explained to her numerous times through the use of interpreters. During one of the visitations, Mother fed C.P. crackers, which he was not supposed to have because they posed a choking risk.

{¶17} According to Motley, Mother was in denial about C.P.'s condition and the need for the special diet. Mother indicated to her that C.P. appeared to be healthy and, therefore, she did not see the need for the special diet. Kim Kuczma, Motley's supervisor who had also been involved in the case since 2007, testified that there were always ongoing concerns with Mother. Kuczma further testified that Mother did not seem to understand the importance of maintaining C.P. on the special diet.

{¶18} Because of that incident, the supervised visitations were moved to the Agency. Motley testified that during the visits, Mother would change C.P.'s diaper and feed him a little, and after that would "kind of [sit] back off to the side."

{¶19} Motley was removed from the case in November 2012. The Agency social worker who took over the case, Matthew Goodwin, had previously occasionally filled in for Motley and was familiar with the case.

{¶20} Goodwin testified that at his first supervised visit between Mother and C.P., Mother changed C.P.'s diaper and tried to feed him, but then "mostly sat back and observed." According to Goodwin, Mother interacted with C.P. for approximately 25-30 minutes of the two-hour visit.

{¶21} At the next supervised visit, an interpreter was present, and through the interpreter, Goodwin communicated with Mother about C.P.'s condition. Goodwin was

of the opinion that Mother did not have much understanding about C.P.'s condition. Goodwin testified that he saw some level of bonding between Mother and C.P., and that Mother would bring gifts for C.P. and take his picture.

**Mother's Case**

{¶22} In addition to parenting and domestic violence programs, Mother counseled with Judy Gogolen, a therapist who Mother had been seeing for years prior to her involvement with the Agency, and Dr. Jaina Amin, a psychiatrist. Both testified at trial on Mother's behalf, and established that Mother suffered from major depression and had been prescribed anti-depressants and sleep aid medication. They both testified that, in their opinions, Mother should have legal custody of C.P.

{¶23} The record demonstrates that the relationship between Gogolen (Mother's therapist) and Motley (the initial county social worker) was strained. According to Gogolen, Motley would call her seeking negative information about Mother, which she refused to provide.

{¶24} Gogolen testified about Mother's distrusting relationship with Motley and Mother's reporting to her that no interpreter was present at many of her meetings with Motley. Gogolen also testified that she herself did not agree with Motley's opinions of Mother.

{¶25} Gogolen testified that Mother regularly attended sessions with her and that she believed that Mother had made progress over the years. Gogolen further testified that Mother expressed concerns about C.P. to her and was interested in learning more

about his condition. According to Gogolen, Mother never told her that Father had been domestically violent with her.

**{¶26}** Gogolen admitted, however, that, against her advice, Mother chose to stay in her relationship with Father. Gogolen also admitted that she advised Mother, that although the decision was hers, it was best for her to continue taking her medication, because as Gogolen noted in her May 2012 notes, Mother was "still very, very depressed." Gogolen was concerned that Mother's depression could "pop up again when not expected."

**{¶27}** Dr. Amin testified that Mother was "medication compliant," but that Mother stopped taking her medications when she felt that she no longer needed them. Thus, Dr. Amin took Mother off of her medications in January 2012, not because the doctor felt Mother did not need them, but because Mother felt she did not need them.

**{¶28}** Brian Freeman, Mother's substance abuse counselor, also testified on Mother's behalf. Freeman specialized in providing addiction recovery services for the deaf, and began working with Mother in May 2010.

**{¶29}** Originally, Mother had been diagnosed with alcohol abuse. However, in the summer of 2010, that diagnosis was changed to alcohol dependent because it was discovered that Mother consumed alcohol on a daily basis.

**{¶30}** Freeman initially referred Mother to a nighttime Alcoholics Anonymous ("AA") meeting at a West 14th Street location in Cleveland; that particular meeting time and place had accommodations for the hearing impaired. Mother did not consistently

attend, however, because she was concerned about her safety in the area and her vision problems made it difficult for her to get around at night. Mother opted to attend regular church services instead.

{¶31} Although Freeman testified that he believed that AA meetings were "very, very important," he also testified that he believed the church services were beneficial to Mother; Motley, the social worker, did not believe the church services were helping her, or at least not as the sole measure of addressing her substance abuse issues.

**C.P.'s Guardian Ad Litem**

{¶32} C.P.'s guardian ad litem recommended to the court that granting permanent custody of him to the Agency would be in his best interest.

### III. Law and Analysis

{¶33} Mother raises the following error for our review: "The trial court's order granting permanent custody to the CCDCFS was not based upon sufficient clear and convincing evidence."

{¶34} The termination of parental rights is governed by R.C. 2151.414. *In re M.H.*, 8th Dist. Cuyahoga No. 80620, 2002-Ohio-2968, ¶ 22. R.C. 2151.414 requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child under R.C. 2151.414(D), and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to

take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1); *see also In re J.M-R.*, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, ¶ 26.

{¶35} Clear and convincing evidence is defined as:

> that measure or degree of proof which is more than a mere "preponderance of the evidence" but not to the extent of such certainty required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.

*In re Awkal*, 95 Ohio App.3d 309, 642 N.E.2d 424 (8th Dist.1994), fn. 2, citing *Lansdowne v. Beacon Journal Publishing Co.*, 32 Ohio St.3d 176, 512 N.E.2d 979 (1987).

{¶36} Therefore, an appellate court will not reverse a juvenile court's decision awarding permanent custody to an agency if the judgment is supported by clear and convincing evidence. *In re J.M-R.* at *id.*

{¶37} The weight of the evidence concerns "'the inclination of the greater amount of credible evidence, offered at trial, to support one side of the issue rather than the other [and] indicates clearly to the [factfinder] that the party having the burden of proof will be entitled to their verdict.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

**{¶38}** When conducting a manifest weight review, the reviewing court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Eastley* at ¶ 20, citing *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001).

**{¶39}** Although we consider credibility in a manifest weight review, we are mindful that the knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. *In re A.D.*, 8th Dist. Cuyahoga No. 85648, 2005-Ohio-5441, ¶ 6. Therefore, the discretion that a trial court enjoys in custody matters should be afforded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. *Id.*

**{¶40}** Mother contends that the trial court's decision was not supported by clear and convincing evidence because (1) a "significant aspect of the case involves [her] deafness and vision loss and * * * the Agency's failure to accommodate this condition," (2) she attended parenting and domestic violence programs, (3) she visited with C.P. and bonded with him, and (4) she was compliant with her medication schedule, and only stopped it because she "developed other mechanisms for coping with her depression."

**{¶41}** It is true that Mother's hearing impairment posed difficulties in this case. But we do not find that CCDCFS failed to accommodate Mother in this regard. The

record establishes that Mother was insistent on continuing her treatment with professionals who had helped her in the past — her substance abuse counselor, Brian Freeman; her psychiatrist, Dr. Amin; and her therapist, Judy Gogolen — and was resistant to help from the Agency.

{¶42} Freeman attempted to get Mother involved in an AA program for the hearing impaired, but due to the time and location, Mother did not attend. Rather, Mother substituted going to church services for the AA meetings, an action Freeman sanctioned.

{¶43} Gogolen suggested to Mother that she continue with her medications because she was "still very, very depressed," and Gogolen was concerned that Mother's depression could be manifested when not expected. Despite Gogolen's urging, Mother decided she no longer needed her medications and Dr. Amin stopped prescribing them for that reason. On this record, we are not persuaded by Mother's contention that she was compliant with her medication schedule, and only stopped it because she "developed other mechanisms for coping with her depression."

{¶44} The record supports the trial court's finding that, "[t]o put it bluntly, the defense witnesses did nothing to persuade [the] Court that [Mother is] capable of providing a safe, stable, and sober home for [the] child. I[n] fact, the defense witnesses strengthened the state's case that permanent custody is in the child's best interest."

{¶45} Mother did attend parenting programs, but the record demonstrates that she did not benefit from them to the point where she remedied the conditions that led to the

removal of C.P. in the first place. Likewise, she attended domestic violence programs, but had a violent altercation with Father after she had completed the first program. Also, in the past, when she was faced with the choice of living alone with Father, or living with her children, Mother picked living with Father.

{¶46} Moreover, other prevalent issues besides Mother's hearing impairment were present in this case. The other issues included: (1) the involuntary termination of Mother's parental rights with respect to four of her other children and the fact that none of her eight children lived with her; and (2) Mother's denial about C.P.'s medical condition and, therefore, non-compliance with his special dietary needs.

{¶47} The trial court considered the factors under R.C. 2151.414(D)(1) in determining that it was in C.P.'s best interest that CCDCFS be granted permanent custody of him, and found that subsection (d) applied, that is, that C.P. had been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period.[3]

---

[3]Those factors are:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an

**{¶48}** The court also found that several factors under R.C. 2151.414(E) indicated that C.P. should not be placed with Mother. Specifically, the court found that:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home, as set forth under subsection (1);
>
> (2) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code * * * and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child,

as set forth under subsection (11); and (3) other relevant factors, as allowed for under subsection 16, which the court found to be C.P.'s medical condition and Mother's denial about it.

**{¶49}** With respect to Mother's visitation and bonding with C.P., it is true that she visited with him and, according to social worker Goodwin, there was some bonding. But both Motley and Goodwin testified that after her initial interaction with C.P. during the supervised visits, she would "sit back" and observe, rather than interact with C.P.

---

equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶50} Finally, because at the time of C.P.'s birth Mother's parental rights had been terminated as to four of her other children, the Agency sought, and the trial court granted, a determination that reasonable efforts for reunification were not required. Nonetheless, as the trial court noted, the Agency did make efforts to see if Mother and C.P. could be reunited. However, the record demonstrates that although Mother may have made some progress, not enough progress was made to support a clear and convincing determination that it was in C.P.'s best interest to be reunited with Mother.

{¶51} Thus, on this record, clear and convincing evidence supports the trial court's judgment granting permanent custody of C.P. to CCDCFS. Mother's sole assignment of error is, therefore, overruled.

{¶52} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., PRESIDING JUDGE

PATRICIA ANN BLACKMON, J., and
TIM McCORMACK, J., CONCUR