# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 106422**

# IN RE: J.P., ET AL.

# MINOR CHILDREN

[Appeal by Y.B., Mother]

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD 15904618, AD 15904619, and AD 15904620

**BEFORE:** Blackmon, J., McCormack, P.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** September 20, 2018

[Cite as *In re J.P.*, 2018-Ohio-3790.]

**ATTORNEYS FOR APPELLANT**

Gregory T. Stralka
6509 Brecksville Road
P.O Box 31776
Independence, Ohio 44131


**ATTORNEYS FOR APPELLEE**
**C.C.D.C.F.S.**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Anthony R. Beery
Assistant County Prosecutor
4261 Fulton Parkway
Cleveland, Ohio 44144

**Guardian Ad Litem for Children**
**Jo.P., G.P., and Y.B.**

William T. Beck
Christopher R. Lenahan
2035 Crocker Road, #104
Westlake, Ohio 44145

James R. Skelton
4807 Rockside Road, Suite 530
Independence, Ohio 44141

Brian W. Sharkin
Law Office of Brian W. Sharkin
P. O. Box 770824
Lakewood, Ohio 44107

PATRICIA ANN BLACKMON, J.:

{¶1} Y.B. ("Mother") appeals the juvenile court's decision terminating her parental rights and awarding permanent custody of her children Jo.P., G.P., and Ja.P. ("the Children") to the Cuyahoga County Department of Children and Family Services ("CCDCFS"). Mother assigns the following error for our review:

> The findings by the trial court granting permanent custody
> was [sic] against the manifest weight of the evidence.

{¶2} Having reviewed the record and pertinent law, we affirm the trial court's judgment. The apposite facts follow.

{¶3} On April 6, 2015, CCDCFS filed a complaint alleging that the Children were dependent and seeking a disposition of protective supervision while the Children remained in Mother's custody. The gist of this complaint, as well as this appeal, is that Mother "lacks the appropriate judgment and parenting skills necessary to provide adequate care for the children due to her [developmental] disabilities."

{¶4} The court set a hearing for April 24, 2015, sua sponte raising the issue of emergency custody to CCDCFS. At this hearing, the court granted its own motion, finding that "the continued residence of the [Children] in * * * the home will be contrary to [their] best interest and welfare for the reasons indicated in the motion."

{¶5} On June 17, 2015, CCDCFS filed an amended complaint seeking temporary custody of the Children rather than protective supervision. On July 14, 2015, the court adjudicated the Children to be dependent, and on July 22, 2015, the court granted temporary custody of the Children to CCDCFS.

{¶6} On February 29, 2016, CCDCFS filed a motion to modify temporary custody to permanent custody. The court held hearings on this motion on April 20, 2017, August 22, 2017, and September 19, 2017. The court issued a journal entry on September 22, 2017, terminating Mother's parental rights and granting permanent custody of the Children to CCDCFS. It is from this order that Mother appeals.

## Standard of Review

{¶7} We review the court's granting permanent custody to CCDCFS under the following standard:

> R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency. The statute requires the court to find, by clear and convincing evidence, that (1) granting permanent custody of the child to the agency is in the best interest of the child under R.C. 2151.414(D), and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive 22-month period. R.C. 2151.414(B).

In re J.M-R, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, ¶ 26.

## Background

{¶8} Mother has developmental disabilities and mental health issues and receives a "host of services" through the Cuyahoga County Board of Developmental Disabilities

("CCBDD"). The Children's father, J.P., was their primary caregiver and lived in Mother's home with Mother and the Children until 2014, when he pled guilty to raping Mother's four-year-old niece. J.P. is currently incarcerated with a scheduled release date of 2039. After J.P.'s imprisonment, CCDCFS became involved, because "Mother is overwhelmed with the care of the children and her protective capacities are questionable at this time." In addition to the individual assistance Mother was receiving from CCBDD, she began receiving assistance in caring and providing for the Children.

## Custody Hearing Testimony

{¶9} Ramona Miller testified that she is a support administrator for CCBDD. In this capacity, she has been working with Mother since 2012. Mother qualifies for a "Level 1 waiver [which] provides the least amount of funding to safely maintain an individual in the community." This includes providing transportation, work services, and drop-in services to Mother for four- to-five hours a week. Miller explained that she is assigned to work with Mother and, although she had occasion to observe Mother with the Children, other agencies provided services for the Children. Miller testified that primarily, she is assisting Mother. "The children had their own providers, so of course, you know, over the course of working with the family so long I've met providers from different agencies that were assigned to the children specifically." According to Miller, it is not her "job to assess [Mother's] parenting abilities."

{¶10} Miller testified that Mother has been diagnosed with a "severe chronic disability." This disability includes "substantial functional limitations" in the following

areas: "Self-care, learning, self-direction, and economic self-sufficiency." Miller further explained that Mother "is able to make decisions about daily routines that are consistent with one's own lifestyle, values, and goals * * * with assistance of another person for reminding, planning or adjusting routine even with familiar situations."

{¶11} In Miller's opinion, Mother is able to live independently and is cooperative with her service providers. Miller also testified that she "personally never observed any concerns" about the Children living with Mother.

{¶12} Angela Wilson testified that she was Mother's Nurturing Parent Coach at Ohio Guidestone. Wilson's "closing email" regarding Mother's case stated that "Mother's delays often prohibited her from fully grasping material, limiting her ability to increase her parenting skills." Wilson testified that Mother "received a certificate of attendance, but not successful completion. So she attended the entire program, but I could not give her a certificate to state that she understood and would be able to apply the curriculum discussed to her routine."

{¶13} Salina Agee testified that she is a social service worker at CCDCFS and she became involved in Mother's case in July 2015. Mother's case plan included mental health, counseling, psychiatric evaluation, parenting, developmental disability services, and housing. At the time of the hearing, Mother had not resolved the issues on her case plan as they related to her children. According to Agee, "although she has a very good heart and wants to do the best for her children, she's very limited in her ability to do so.

They still need constant redirection. There's still concern that they're not properly being monitored and [Mother] still lacks the ability to control their behaviors."

{¶14} For example, Agee testified that Mother would not be able to meet the Children's basic housing needs due to the condition of her home. "There's a lot of pests that she needs to address. Bugs and bed bugs and rodents and cockroaches. There's a lot of repairs as far as like damages to like plumbing and a lot of clutter that's in the home * * *."

{¶15} Agee testified that decision-making skills is another area of concern for Mother. For example, after learning of the allegations that the Children's father raped Mother's niece, but prior to the father's convictions, Mother allowed the father unsupervised access to the Children.

{¶16} Agee additionally testified that CCDCFS encouraged Mother to get support from other adults who may have been able to help her care for the Children. As a result, Mother rented part of her house to two women, Tequila Crump and Ursula Owens, who were raising Crump's five-year-old daughter together. Mother told Agee that "she wanted to use those two people to live with her to help her care for [the Children]." In March 2017, Crump's daughter was beaten to death inside Mother's house. At the time of the custody hearings, Crump and Owens were under indictment for murder.[1] Mother

---

[1] In July 2018, Owens was convicted of murder and Crump was convicted of negligent homicide in relation to Crump's daughter's death. *State v. Owens*, Cuyahoga C.P. No. CR-17-615579-A (July 10, 2018); *State v. Crump*, Cuyahoga C.P. No. CR-17-615579-B (July 12, 2018).

was not accused of being involved in the death, but Agee testified that "what occurred in [Mother's] home are things that have been a concern, an ongoing concern that mom has an inability to make good decisions about who to keep around herself and [the Children]."

**{¶17}** Agee further testified about the Children and their foster mother. Jo.P., whose date of birth is May 19, 2008, has no special needs; G.P., whose date of birth is October 15, 2009, is autistic; and Ja.P., whose date of birth is August 23, 2013, has cognitive delays. Both G.P. and Ja.P. receive services from CCBDD. Agee testified that all three Children have resided with the same foster mother since being removed from Mother's home and the Children "continue to get better" under the foster mother's care.

**{¶18}** According to Agee, CCDCFS believes that permanent custody to the agency is in the Children's best interest, because of Mother's "inability to address their special needs and to insure that they're safe. To have appropriate housing so that they can reside in a safe environment."

**{¶19}** On cross-examination, Agee testified that the agency's original recommendation was to keep the Children with Mother under "protective supervision." According to Agee, it was the court — specifically the magistrate — who raised the issue of permanent custody. Agee testified that many of Mother's services were taken away when the Children were removed from the home. Agee agreed that more services would be available to Mother if the Children were living with her. However, due to Mother's

poor progress on her case plan, Agee and CCDCFS recommended permanent custody to the agency as the disposition of this case and did not support a six-month extension of temporary custody.

{¶20} Charlene Walker testified that she has been the Children's foster mother since April 2015. According to Walker, the Children love Mother, and Mother loves the Children. However, Walker testified that she does not like to stay for the Children's visitations with Mother. "Because I don't like to watch the way that they misbehave with her or not listen to her. Just look at her when she telling [sic] them to do something or just totally out of control. She's got to chase them around the library. It's just hurtful to see. I don't like to stay in there. I try to sit in my car."

{¶21} Walker testified that the Children were "[v]ery much out of control" when they came into her care. Walker testified that the Children have become "much better, much more cooperative" over the past two years. The two youngest children receive services for special needs, and the oldest is in counseling "trying to teach him to be a child" again. According to Walker, Jo.P. feels "responsible for" G.P. and Ja.P. and "just wants to be there for them every little move." Walker continued:

> [Jo.P.] is learning that he doesn't have to be the father. When he came to me everything was I got it, I got it, I got it. I'm like [Jo.P.], I got it. You don't have to do that. I take care of the boys here. Still now he will still forget and try to be the father. I'm like, you don't have to. I need you to be a kid and that's what they were — he goes to therapy every week through Ohio Guidestone and that was one of the main things they were dealing with, trying to teach him to be a child.

**{¶22}** Jo.P. was just shy of his seventh birthday when the Children were placed in Walker's care.

**{¶23}** Nicole Crespo testified that she is the office manager at Comfort Solutions Home Care, which is a service provider for CCBDD. Crespo has been involved in Mother's case since 2015 in the following role:

> Make sure that all her needs on her service plan that is provided to us by the Board of Developmental Disabilities are met. If she has any needs such as if she has questions in regards to getting certain things, things like that, she will go ahead and call me and then I would give her the resources or assist her in calling those places for whatever needs she has at that time.
>
> I also maintain the client's schedule with the aide's schedule, make sure that the aide goes out and provides her with the services.
> * * *
>
> Which in her individual case it is helping her out into the community, it is assisting her with medical appointments, helping her to get to functions like this.
>
> So being safe in the community and assisting her with medical appointments and also things like going down to Job & Family Services and helping her with all her paperwork, you know, be kept in line.

**{¶24}** Crespo testified that her agency provides four hours of services to Mother per week. When the Children were living with her, Mother received six hours of services per week, and the Children received an additional ten hours per week. Crespo testified as to why Mother was receiving services from Comfort Solutions: "To prevent her from being overwhelmed with the children. Specifically, when they got home from school and were hungry real quick or, you know, things like that, needed homework done.

So we tried to be in place to assist her with planning so she would have the extra time to deal with one or the other."

**{¶25}** Crespo testified that it is possible for someone who is a "Level 1 waiver" with CCBDD to raise their children properly. Crespo testified that Mother's case is a "unique situation" for her, because "[t]his is the first time I had to come to court with a client. I have never had one of my clients loose [sic] their children." According to Crespo, Mother was able to meet the basic needs of the Children while they were living with her.

**{¶26}** Ronnetta Mitchell testified that she is a home health aide with Comfort Solutions and she has provided services for Mother since February 2015. Mitchell testified that she was present for a meeting between Mother and CCDCFS at Mother's house prior to the Children being removed. She recalled that Mother "had a glass table that was a little wobbly" and "a refrigerator where the door fell off," and CCDCFS asked Mother to remove these items from her home. According to Mitchell, "She immediately got on it. Within a week later she had another refrigerator and the glass table was removed within a couple of days of them asking." Additionally, CCDCFS noted that Mother "was missing a baby gate" for Ja.P., who was a toddler at the time.

**{¶27}** As to Mitchell's observations of Mother's interaction with the Children, Mitchell testified as follows:

Q:      * * * did you observe mom interact with her kids?

A:      Yes, I did.

Q:     Okay.   Can you please describe those interactions?

A:     Very loving, helpful, caring.

Q:     Okay.

A:     She would try her best to help one with his homework as I helped the other one with his.

Q:     Did you have any concerns about the children's safety while you were in the home?

A:     No.

Q:     Are you a mandatory reporter?

A:     Yes, I am.

Q:     Will you call Children & Family Services if you notice a problem with [Mother] or anyone else, any of your clients?

A:     I would have to follow protocol.

Q:     What does that mean?

A:     I would have to call and speak with management and then we will go forth with calling CFS.

Q:     Okay. And did you ever have to do that when you were involved with mom and her family?

A:     No.

Q:     Okay.   When you were involved in the home, was [Mother] able to meet the basic needs of her children?

A:      Yes, she was.

**{¶28}** Mitchell explained, however, that she "was only in care of the children for two weeks before they were removed." Mitchell further stated that she only observed what Mother was able to do with Mitchell in the home assisting her.

**{¶29}** William Beck, the Children's GAL, testified as follows:

> I stand by my report that was filed. I believe that the Agency's request at this time is appropriate and that permanent custody would be in the children's best interest.
>
> * * *
>
> Based on my interactions with mom independently as well as with the kids, I don't disagree * * * that the children are bonded with mom, but my own independent interactions with mom I believe she may have some difficulty in providing for the children in her home.

### Juvenile Court's Findings

**{¶30}** The juvenile court's September 22, 2017 journal entry terminating Mother's parental rights and committing the Children to the permanent custody of CCDCFS states in part as follows:

> [T]he Court finds by clear and convincing evidence that the [Children] cannot be placed with [Mother] within a reasonable time or should not be placed with [Mother] for the following reasons:
>
> The [Children have] been in temporary custody of a public children services agency or private child placing agency for twelve (12) or more months of a consecutive twenty-two (22) month period. The [Children have] been in temporary custody since July 23, 2015.
>
> Mother has chronic mental illness, chronic emotional illness, and serious, intellectual disability that is so severe that it makes [M]other unable to provide an adequate, permanent home for the child at the present time and, as anticipated, within one (1) year after the Court holds the hearing in this matter.

Mother has cognitive delays that make her unable to manage her own special needs and thus, is unable to provide a safe, stable environment for [the Children].

Mother has stable housing, however, cognitive delays preclude her from providing adequate food, clothing, and shelter or to prevent the [Children] from suffering emotional or mental neglect, as evidenced by her unwillingness to successfully complete a case plan so she can provide care for the [Children].

* * *

The Court finds, based on the evidence and testimony presented, the recommendation of the Guardian ad Litem, and after considering all relevant factors, including but not limited to each of the factors listed in R.C. 2151.414(D)(1)-(5), that an order of permanent custody is in the [Children's] best interest.

## Analysis

{¶31} All witnesses testified consistently that Mother loves and has a strong bond with the Children. There is evidence in the record that, with the proper assistance, Mother would be able to provide adequate care for the Children. It is undisputed that Mother receives some assistance from CCBDD and its affiliated agencies, and that Mother would receive additional services, conditioned on available funding, if the Children were placed back in Mother's home. Furthermore, two of the Children also receive services from CCBDD. Although the exact amount of services that may be provided is unknown, evidence in the record shows that services would not be provided on a "24/7" basis. Therefore, what this case turns on is whether it is in the best interest

of the Children to be placed back into Mother's care, given the services Mother and the

Children would receive.

> **{¶32}** R.C. 2151.414(D)(1) lists factors the court shall consider in determining whether permanent custody is in the best interests of the Children:    (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * * ;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶33}** Under subsection (a), the interaction and interrelationship of the Children

and Mother are good, although several witnesses testified that Mother has difficulty

controlling the Children.   The Children also have a good bond with their foster mother.

**{¶34}** Subsection (b) requires the court to take into consideration the wishes of the

Children.   Jo.P., who was eight years old at the time, testified at an in camera hearing as

to the reason he was in court:   "To help me figure out if I go home with my mom or not."

 Jo.P. testified that living with his foster mom was "great."   He testified that he liked

visiting with Mother, "[e]xcept when she tells me that I'm going home, me and my

brothers are going home, because that just worries me a lot. * * * Because I don't know if I'm really gonna go home or not." Asked if he wanted to live with Mother, Jo.P. testified as follows: "Yes. But against my safety, I don't care if there's a 55 percent chance I won't go home and a 45 percent chance I will go home. * * * Like it wasn't safe there. Bus drivers didn't care that they missed a street, and then when the parents called that they missed a street, they said the student just walked home."

{¶35} Asked where he would go if he could live anywhere he wanted, Jo.P. replied, "Now, that's a hard question, but I would have to say Darien Lake or Cedar Point." Asked who he would want to live with, Jo.P. again replied that "[t]hat's a pretty hard question," but ultimately answered, "[t]o probably get adopted or go home. I really don't know."

{¶36} Additionally under subsection (b), the GAL testified that permanent custody to the agency would be in the Children's best interest. Specifically, the GAL found that Mother has a developmental disability and "has had difficulty caring for her children [and] has not been able to fully grasp the materials and successfully complete the [parenting] program." The GAL expressed concern that "Mother continued to allow father to be the primary care giver, and to have unsupervised contact with the children after learning of a criminal indictment" for child rape. The GAL further found that Mother is not able to provide for the special needs of G.P. and that she "does not have appropriate housing."

**{¶37}** Under subsection (c), the Children are "considered to have entered the temporary custody" of CCDCFS on June 23, 2015.[2] When the motion for permanent custody was filed by CCDCFS on February 29, 2016, the Children had been in the temporary custody of the agency for approximately eight consecutive months. During the period when the three custody hearings took place, the Children had been in the temporary custody of the agency for between two and two-and-a-half years.

**{¶38}** Under subsection (d), the Children are currently between the ages of five and ten years old, and they need legally secure permanent placement. Their father will be incarcerated until 2039, no relative or other person is being considered for custody, and the foster mother has told CCDCFS that she is not pursuing adoption. There is no evidence in the record of another option to achieve permanent placement.

**{¶39}** R.C. 2151.414(E) governs factors the court should consider when determining whether a child cannot be placed with his or her parent within a reasonable period of time or should not be placed with his or her parent. To terminate parental rights, the court need only find that one factor exists, and the court's determination must be made "by clear and convincing evidence * * *."

**{¶40}** Subsection (1) states as follows:

---

[2]Pursuant to R.C. 2151.414(D)(1), "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant [abused, neglected, or dependent] or the date that is sixty days after the removal of the child from the home." In the instant case, the Children were adjudicated dependent on July 15, 2015. The Children were removed from Mother's home on April 24, 2015, and 60 days after this is June 23, 2015.

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

**{¶41}** Subsection (2) states in part as follows: "Chronic * * * intellectual disability * * * of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * *."

**{¶42}** The evidence in the case at hand is consistent that Mother was cooperative with her service providers and that she tried to utilize many resources. This case presents a difficult scenario, because the "problems" that caused the Children to be removed from Mother's care are Mother's severe and chronic intellectual impairments, specifically in the major life activity areas of self-care, self-direction, economic proficiency, and learning/cognition. According to CCBDD's report, Mother's "diagnosed disability is likely to continue indefinitely."

**{¶43}** The Children's GAL, Mother's parenting coach, and the CCDCFS social worker testified in support of permanent custody of the children to the agency, essentially stating that Mother's developmental delays limit her ability to parent.

**{¶44}** The support administrator for CCBDD testified that she never observed any "concerns" when the Children were living with Mother, but noted that it is not her "job to assess [Mother's] parenting abilities." The office administrator of one of Mother's service providers testified that Mother was able to meet the basic needs of the Children. Mother's home health aide also testified that Mother was able to meet the Children's basic needs; however, this was based on observations made when the aide was assisting Mother over a two-week period prior to the Children being removed from Mother's home.

**{¶45}** We are mindful that child abuse and substance abuse are not part of this case, Mother has no criminal history, she has a loving relationship with the Children, and she has had no other children removed from her care. Nonetheless, we find that the juvenile court's decision committing the Children to the permanent custody of CCDCFS is supported by clear and convincing evidence in the record.

**{¶46}** Judgment affirmed.

It is ordered that appellees recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

PATRICIA ANN BLACKMON, JUDGE

TIM McCORMACK, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR
KEY WORDS: