**[Cite as *In re E.C.* , 2020-Ohio-3807.]**

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE E.C., ET AL.

Minor Children

[Appeal by D.C., Mother]

:
:
:
:
:

No. 109398

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 23, 2020

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD18906596, AD18906597, and AD18906598

*Appearances:*

Kelly M. Zacharias, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

MARY J. BOYLE, P.J.:

{¶ 1} Appellant, D.C. ("mother"), appeals the juvenile court's judgment granting permanent custody of her children, E.C. (d.o.b. May 20, 2009), A.C. (d.o.b. October 3, 2010), and Al.C. (d.o.b. October 20, 2012), to appellee, Cuyahoga County

Department of Children and Family Services ("CCDCFS"). Mother raises three assignments of error for our review:

> 1. The CCDCFS has failed to show that a grant of permanent custody would be in the best interest of the child and that the child cannot or should not be placed with a parent within a reasonable period of time.
>
> 2. The Court erred in its finding there is no known Native American Ancestry.
>
> 3. [CCDCFS] did not meet its burden under ICWA by failing to treat the children as Indian Children.

{¶ 2} Finding no merit to mother's assignments of error, we affirm the juvenile court's judgment.

## I. Factual and Procedural Background

{¶ 3} CCDCFS received emergency temporary custody of the children on May 21, 2018, pursuant to an ex parte telephonic order, and placed them with their aunt, who was married to mother's brother ("aunt").

{¶ 4} On May 22, 2018, CCDCFS filed a complaint for neglect, dependency, and temporary custody to CCDCFS, and simultaneously filed a motion for predispositional temporary custody. In the complaint, CCDCFS alleged that mother had issues with mental health, anger management, and substance abuse that prevented her from caring for the children. CCDCFS further alleged that the home in which mother and the children were residing was unsanitary, inappropriate, and unstable, that mother was not properly maintaining the children's hygiene, that mother slept during much of the day leaving Al.C. unattended, and that mother and the children's father ("father") had engaged in domestic violence in the children's

presence.  The complaint states that father had a pending criminal court case against him in Erie County for rape, complicity in the commission of rape, gross sexual imposition, and pandering sexually oriented material involving a minor.

{¶ 5} The court held a hearing on May 22, 2018, upon CCDCFS's motion for predispositional temporary custody.  At the hearing, mother denied the allegations in the complaint and objected to a finding of probable cause.  After hearing testimony, the court found probable cause for the children's removal and granted CCDCFS's motion for predispositional temporary custody.

{¶ 6} In June 2018, CCDCFS filed mother's case plan with the juvenile court.  The goal of the case plan was for the children to be reunified with mother. Under the case plan, mother's goals included the following: (1) obtain stable and safe housing, (2) ensure that the children's basic needs were met on a regular basis, (3) undergo a psychological evaluation and actively participate and complete any treatment recommendation, (4) complete a drug and alcohol assessment and follow all recommendations, (5) maintain sobriety for at least six months before reunification with the children, and (6) complete a parenting program approved by a social worker.

{¶ 7} The court appointed a guardian ad litem ("GAL") for the children.  On August 9, 2018, the GAL filed a report and recommendation.  The report explained that mother had been estranged from her family for ten years, but when father was incarcerated, she moved back to Ohio and moved in with her mother ("grandmother").  The report states that a "conflict arose" between mother and

grandmother.  Mother moved in with a friend, and she told the GAL that the housing was not proper for her children.  At mother's request, aunt came from her home in Florida to Cleveland to take the children back to Florida to live with her and her husband.  Aunt filed for custody of the children and stayed in Cleveland with mother's brother ("uncle") and the children while this case progressed.  The GAL reported that she twice visited the children at their uncle's house, and E.C. seemed excited about the idea of moving to Florida with their aunt.  He told the GAL that sometimes mother "was really sleepy and didn't feed us."  A.C. likewise told the GAL that he wanted to move to Florida with aunt.  Al.C., the youngest at five years old, told the GAL that she was going to duplicate herself to stay in Ohio and move to Florida.  The GAL reported that when she spoke with mother in July 2019, mother was "very agitated" and told the GAL she no longer wanted the children placed with aunt.  The report further states that mother agreed that CCDCFS should receive temporary custody of the children and that she was not complying with the recommendations in her case plan.

{¶ 8}  At an adjudication hearing on August 13, 2018, mother stipulated to the allegations in the amended complaint, which removed neglect.  The amended complaint alleged that mother was held in a psychiatric unit in December 2017, was often verbally aggressive toward grandmother, and while at grandmother's house she punched and shattered a window while Al.C. was in the home.  CCDCFS alleged that mother needed to engage in a substance-abuse assessment, find appropriate housing, and maintain Al.C.'s hygiene.  CCDCFS further alleged that mother left the

violent relationship with father, who had a pending criminal case against him. CCDCFS presented evidence of the certified indictment against father. The juvenile court found the three children to be dependent. The juvenile court also approved the case plan for reunification.

{¶ 9} The juvenile court held a dispositional hearing on August 15, 2018, where mother agreed that the children should be placed in the temporary custody of CCDCFS. The juvenile court awarded CCDCFS temporary custody of the children, found that they were not members of a federally recognized Indian tribe, and found that their continued residence or return to mother's home was contrary to their best interest. The magistrate's dispositional order was approved and adopted by the juvenile court on September 4, 2018.

{¶ 10} In November 2018, CCDCFS conducted a semiannual review ("SAR"). According to the SAR, mother was living with a friend, no home visit had been completed, and mother declined to work with the recommended resources to obtain her own housing. Regarding mental health, mother declined to seek the recommended services. CCDCFS noted that mother voluntarily hospitalized herself overnight for self-injurious behavior in December 2017, and she was diagnosed with major, severe, and recurrent depression and post-traumatic stress disorder. Mother completed a psychological evaluation through the juvenile court diagnostic clinic, which reported that mother was guarded and evasive, chose not to amend her diagnoses, and recommended that mother engage in therapy and complete an assessment to determine if she should receive medication. As to substance abuse,

mother tested positive for marijuana in June and July 2018. In November 2018, mother completed a substance-abuse assessment and received a recommendation for nonintensive outpatient treatment. At that time, mother tested positive for alcohol, marijuana, and cocaine. The juvenile court diagnostic clinic also found that mother had a moderate cannabis use disorder. Regarding parenting, mother was participating in supportive visitation with the children but denied that she had parenting issues. She had missed only one visit. She brought games and read to the children during the visits, and she sometimes talked to the children "in a military like fashion." CCDCFS recommended that the children remain with their aunt and receive counseling.

{¶ 11} CCDCFS conducted another SAR in May 2019. Regarding housing, mother was living with her boyfriend but was not on the lease. As to mental health and substance abuse, mother had not engaged in the recommended therapy. Mother did not complete the requested drug screens in December, January, February, March, or April. Regarding parenting, mother was engaging in the supportive visitation program and was appropriate with the children. CCDCFS recommended that the children's aunt and her husband in Florida should receive legal custody of the children.

{¶ 12} On May 21, 2019, CCDCFS filed a motion to modify temporary custody of the children to permanent custody. CCDCFS alleged that the children could not be placed with either parent within a reasonable time or should not be placed with either parent, and that at least one of the factors under R.C. 2151.414(E)

applied. CCDCFS averred that mother did not have independent housing, had not engaged in recommended individual counseling or nonintensive outpatient treatment, and had not complied with random drug screens. CCDCFS alleged that an award of permanent custody to CCDCFS would be in the children's best interest.

{¶ 13} The juvenile court held a dispositional review hearing on July 29, 2019, and considered testimony presented by the child protection specialist from CCDCFS assigned to the case. The juvenile court found that mother had not made significant progress on her case plan, that CCDCFS had made reasonable efforts to finalize the permanency plan of reunification with mother, and that a continued extension of CCDCFS's temporary custody pending the hearing on CCDCFS's motion for permanent custody was in the children's best interest. The magistrate's dispositional order was approved and adopted by the juvenile court on August 14, 2019.

{¶ 14} On September 16, 2019, mother filed a motion to terminate temporary custody of the children to CCDCFS and to grant legal custody to her brother (uncle). Mother stated that the children had been residing with uncle since June 2019 and were happy there, and that uncle was willing to assume custody of the children and could provide for their basic needs.

{¶ 15} On September 23, 2019, the GAL filed a report and recommendation in advance of trial. The GAL explained that uncle was willing to care for the children on a short-term basis, but uncle felt that it was in the children's best interest for them to live with aunt and her husband in Florida. The GAL reported that aunt and

her husband were willing to adopt the children but not to accept legal custody because aunt and mother disagreed about the children attending church. The GAL stated that mother had not completed case plan services, the juvenile diagnostic clinic's recommendations, or a drug and alcohol program. Mother still needed mental health services and had not remedied the conditions that caused the children's removal. The GAL recommended that mother's motion for legal custody to uncle be denied and that permanent custody of the children be granted to CCDCFS.

{¶ 16} In November 2019, CCDCFS conducted another SAR. As to housing, mother was still living with her boyfriend, and she was not included on a lease or deed but mother's boyfriend reported that mother and the children were welcome in his home. Regarding mental health, mother engaged with Recovery Resources. Recovery Resources did not have any recommendations for mother's mental health, but mother did not disclose her prior psychological evaluations and recommendations to Recovery Resources. As to substance abuse, mother completed a drug assessment in May 2019 through Recovery Resources and tested positive for marijuana. On June 4, 2019, mother started outpatient treatment, where she was to attend 20 sessions. During outpatient treatment, the counselor reported that mother would often be on her phone and pull the hood of her sweatshirt over her head. On June 25, 2019, mother was discharged from outpatient therapy because she was testing positive during drug screens and was not participating in groups. In May 2019, mother tested positive for cocaine and marijuana. In June 2019, mother

tested positive for cocaine, marijuana, and amphetamines. Regarding parenting, mother had developed a routine during her visits with the children, and the visits were going well.

## A. Hearing on Permanent Custody

{¶ 17} On December 17, 2019, the juvenile court conducted a trial on CCDCFS's permanent custody motion and mother's motion for legal custody to uncle. Present at the hearing were mother, mother's attorney, uncle, uncle's partner, the children's GAL, the CCDCFS child protection specialist, and CCDCFS's attorney. At the time of the hearing, E.C. was ten years old, A.C. was nine years old, and Al.C. was seven years old.

{¶ 18} The attorney for CCDCFS told the court that father had been incarcerated throughout the case, that mother had not substantially complied with her case plan, and that the children could not and should not be placed with either parent within a reasonable amount of time. CCDCFS requested that the court grant CCDCFS permanent custody and place the children with aunt and her husband in Florida. Mother's attorney told the court that the children had been doing well living with uncle and that legal custody of the children should go to him.

{¶ 19} The CCDCFS child protection specialist assigned to the children's case reviewed why CCDCFS originally obtained temporary custody of the children. She testified that the permanency plan for the children was reunification with mother, and a case plan was created to facilitate reunification. Father was not involved in the case plan because he was incarcerated. The children were engaging

in individual and family counseling for their case plan services. The case plan services for mother were for housing, mental health, substance abuse, and parenting. Regarding parenting, the child protection specialist testified that mother completed the supported visitation program.

{¶ 20} As to housing and income, the child protection specialist testified that mother had been residing with her boyfriend for approximately the last year and that in September 2019, her boyfriend "deeded" his house to mother. She testified that the house was appropriate for the children. Mother had reported to the child protection specialist that she was working at Rascal House and that she had been working throughout most of the case. Mother had not provided monetary support to the children during the case but brought food for them during some of their visits.

{¶ 21} With respect to mental health, the child protection specialist testified that CCDCFS had referred mother to mental health services throughout the entirety of the case but that mother had only recently begun to engage with these services. In June 2018, mother completed a mental health assessment through Catholic Charities but did not "follow through." In June 2019, mother completed a psychological evaluation through the juvenile court clinic. The child protection specialist testified that throughout this case mother denied that she had any issues with mental health or substance abuse. But the child protection specialist testified that mother sought out her current mental health provider because it was closer to where she was living.

{¶ 22} The child protection specialist explained that mother had only recently begun to engage in substance abuse services. In June 2019, mother went to Recovery Resources but did not successfully complete their services, and in September 2019, she re-engaged in the services. The child protection specialist requested random drug screens of mother, on average once a month, and mother had submitted to five or six screens. The child protection specialist testified that mother's first negative drug screen was on October 1, 2019, so mother had demonstrated her sobriety for the two months before the permanent custody hearing. CCDCFS was still concerned about mother's substance use because she had not completed a program.

{¶ 23} The child protection specialist testified that CCDCFS's temporary custody should not be further extended because mother had not complied with her case plan services. She testified that permanent custody to CCDCFS would be in the best interest of the children because it would provide them with permanency and a safe and stable home environment.

{¶ 24} The child protection specialist explained that if CCDCFS were to receive permanent custody of the children, the permanency plan for the children would be for aunt and her husband in Florida to adopt them. Aunt's husband is mother's brother and uncle's twin. Throughout the case, the children had been placed with aunt, who had moved to Ohio from Florida to care for the children. Aunt initially stayed with uncle but later moved into her own place in Columbia Station with the children and cared for them there. In June 2019, aunt needed to move back

to Florida, and the children were placed with uncle. The child protection specialist testified that the children have a strong relationship with aunt and are bonded with her. Aunt maintained phone contact with the children after she moved back to Florida. Aunt and her husband have passed background checks and would be able to provide for the children. CCDCFS was in the process of evaluating their home, but the evaluation was not complete at the time of the hearing. The children also had a good relationship with their cousins, one of whom is a minor, lives with aunt and her husband, and during part of this case moved to Ohio with aunt. E.C. and A.C. have expressed a desire to live with aunt and her husband in Florida. The child protection specialist testified that based on the information she had received from aunt, she believed that aunt would continue to involve uncle in the children's lives.

{¶ 25} Uncle testified that the children had been placed with him since June 2019, that they were doing very well, and that they were enrolled in school. He said that E.C. was enrolled in an IEP course for math and science, but otherwise the children were doing very well in their classes. They had missed only a few days of school when they were sick, and Al.C. was a classroom helper. Uncle explained that he had attended a few of mother's visits with the children at his house, and the children seemed to have a good bond with mother. The children generally looked forward to mother's weekly visits. Uncle testified that he had concerns about the children reunifying with mother because of "her past history" with drug use.

{¶ 26} Uncle testified that he had personally "gone back and forth" on whether he would accept legal custody of the children. He explained that, "on

paper," aunt and her husband were better qualified to raise the children than he was because they have a higher income, a larger house, and more parenting experience. Aunt was also already a stay-at-home parent. Financially, raising the children would burden uncle more than aunt and her husband, but he would "make it work." Uncle had concluded, however, that "the distance in both space on the map and in family would be more detrimental to the children than the benefits that my sister-in-law and brother can provide." When asked if he were willing to assume legal custody of the children, uncle responded, "if that is what is necessary, yes," but he hoped that the children would eventually be reunified with mother. When asked whether he thought aunt having the children permanently would be in their best interest, he responded, "like I said, when you look at it on paper, I have said that I agreed with that course of action, yes."

{¶ 27} Uncle's partner testified that he lived with uncle and the children, that the children were happy, healthy, and excelling in school, and that he and uncle loved the children very much. He said that he and uncle requested a counselor for the children because A.C. and Al.C. "bicker" with each other. The counselor came to their home, met with the children separately and with uncle and uncle's partner, and had overall been helpful. Uncle's partner testified that mother had been "great" during her weekly visits and had never visited while intoxicated or while smelling of marijuana. He described aunt and her husband as "military people" and that he and aunt had differing opinions on how to raise the children and the children's level of contact with mother. Uncle's partner said that aunt would prevent mother from

seeing the children "as long as she's doing drugs," but uncle's partner would allow the children to visit with mother as long as she was sober during the visits. Uncle's partner testified that he would "absolutely" provide a support system for uncle if the court were to grant legal custody of the children to uncle.

{¶ 28} The children's GAL recommended that permanent custody be granted to CCDCFS for all three children and that the children be placed with aunt and her husband in Florida. She testified that she asked the children on four different occasions with whom they wanted to live, and E.C. and A.C. consistently responded that they wanted to live with aunt. Al.C. was not sure where she wanted to live.

{¶ 29} The GAL also testified that when she first visited uncle, he seemed reluctant to care for the children long term. She explained that he and his partner loved the children, were taking very good care of them, and wanted to help maintain a relationship between mother and the children. She also testified that aunt loved the children and also took very good care of them. The GAL observed that aunt and her husband were reluctant to accept legal custody because they wanted to take the children to church, and mother did not want the children to attend church. But the GAL said that she visited uncle one Sunday and the children and uncle had just arrived home from church.

## B. The Juvenile Court's Decision

{¶ 30} On December 23, 2019, the juvenile court granted CCDCFS permanent custody of the children. The court found that granting CCDCFS

permanent custody was in the children's best interest and that the children could not be placed with either of their parents within a reasonable time or should not be placed with either parent.

{¶ 31} With respect to the factors under R.C. 2151.414(E) (which the court must consider before making the finding under R.C. 2151.414(B)(1)(a), i.e., whether the children could be placed with a parent within a reasonable time or should not be placed with a parent), the court found the following factors apply to mother:

> R.C. 2151.414(E)(1), mother failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside of her home;
>
> R.C. 2151.414(E)(2), mother has a chronic mental illness and chemical dependency that is so severe that it makes her unable to provide an adequate permanent home within one year after the court holds the hearing in this matter;
>
> R.C. 2151.414(E)(4), mother has demonstrated a lack of commitment toward the children by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide for an adequate permanent home for the child; and
>
> R.C. 2151.414(E)(14), mother is unable to prevent the children from suffering emotional or mental neglect.

{¶ 32} With respect to the best-interest factors, the juvenile court considered the GAL's recommendation and that the children had been in the temporary custody of CCDCFS for 12 or more months of a consecutive 22-month period.

{¶ 33} In the same opinion that was journalized on December 26, 2019, December 31, 2019, and January 3, 2020, the juvenile court denied mother's motion for uncle to have legal custody of the children.

{¶ 34} Mother appeals the juvenile court's December 23, 2019 judgment that was journalized on December 26, 2019, December 31, 2019, and January 3, 2020.

## II. Permanent Custody Determination

{¶ 35} The juvenile court's December 23, 2019 judgment both denied mother's motion for uncle to have legal custody of the children, and granted permanent custody of the children to CCDCFS. The grant of permanent custody to CCDCFS terminates a parent's rights forever, while the grant of legal custody of the children to someone else allows a parent to retain "residual parental rights, privileges, and responsibilities, including, but not limited to, the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support[.]" R.C. 2151.011(B)(30); R.C. 2151.353(A)(3)(c). Here, mother's assignments of error and argument challenge only the court's order granting permanent custody to CCDCFS, not the order denying legal custody to uncle. Therefore, we will address only the order granting permanent custody to CCDCFS.

{¶ 36} In her first assignment of error, mother argues that the juvenile court erred in granting CCDCFS permanent custody of the children because CCDCFS failed to show that permanent custody would be in the children's best interest and that the children cannot or should not be placed with either parent within a reasonable period of time.

{¶ 37} Parents have a basic and fundamental interest in the care, custody, and management of their children. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct.

2054, 147 L.Ed.2d 49 (2000); *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990); *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28. Parental rights, however, are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child. *In re K.M.*, 10th Dist. Franklin Nos. 15AP-64 and 15AP-66, 2015-Ohio-4682, ¶ 15, citing *In re Cunningham*, 59 Ohio St.2d 100, 391 N.E.2d 1034 (1979).

{¶ 38} The termination of parental rights is governed by R.C. 2151.414. *In re M.H.*, 8th Dist. Cuyahoga No. 80620, 2002-Ohio-2968, ¶ 22. R.C. 2151.414 sets forth a two-part test courts must apply when deciding whether to award permanent custody to a public services agency. Under the first prong, a court must find by clear and convincing evidence one of the following five factors:

> (a) [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents [In making this determination, the juvenile court must consider the factors set forth in R.C. 2151.414(E)];
>
> (b) The child is abandoned;
>
> (c) The child is orphaned and no relatives are able to take permanent custody of the child;
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period[;] or
>
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a)-(e).

{¶ 39} The second prong requires the court to find, also by clear and convincing evidence, that granting permanent custody of the child to the agency is in the best interest of the child. R.C. 2151.414(D)(1) sets forth best-interest factors that the court must consider when making the best-interest determination under R.C. 2151.414(D)(1), including:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child[;]
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period[;]
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) apply in relation to the parents and child.

{¶ 40} An appellate court will not reverse a juvenile court's decision awarding permanent custody to an agency if the judgment is supported by clear and convincing evidence. *In re J.M-R.*, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, ¶ 28. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). A reviewing court is required to examine the record to determine

whether the trier of fact had sufficient evidence to satisfy the clear and convincing standard. *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 24.

### A. The First Prong – Cannot or Should Not Be Placed with Mother

{¶ 41} In her first assignment of error, mother challenges the juvenile court's finding that the children could not be placed with her within a reasonable time or should not be placed with her.[1] She argues that CCDCFS failed to provide clear and convincing evidence of the R.C. 2151.414(E) factors.

{¶ 42} R.C. 2151.414(E) sets forth 16 factors used to determine whether children cannot or should not be placed with their parents. Some of those relevant factors include whether the parent,

> (1) has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home[;]
>
> (2) [has] [c]hronic mental illness * * * or chemical dependency * * * that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing[;] * * *
>
> (4) has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so[;] * * * or
>
> (14) for any reason is unwilling to * * * prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

*Id.* If a trial court finds by clear and convincing evidence that any one of the 16 factors exists, it must find that the child cannot or should not be placed with a parent

---

[1] Since mother brought this appeal, and father is incarcerated and has been absent from this proceeding, our analysis will focus on whether the children cannot or should not be placed with mother.

within a reasonable period of time and award permanent custody to an authorized agency. *In re D.J.*, 8th Dist. Cuyahoga No. 88646, 2007-Ohio-1974, ¶ 64.

{¶ 43} In its journal entry awarding permanent custody to CCDCFS, the trial court found R.C. 2151.414(E)(1), (2), (4), and (14) to apply. We find that the record clearly and convincingly supports the trial court's findings pursuant to R.C. 2151.414(E)(1) and (2) but not (4) and (14).

{¶ 44} Regarding R.C. 2151.414(E)(1), the trial testimony clearly and convincingly supports the juvenile court's finding that mother has failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside of the children's home. The children were removed from mother's custody due to issues with housing, mental health, substance abuse, and parenting. Mother stipulated to such allegations in CCDCFS's amended complaint. A case plan was created for mother to address these issues. While mother satisfied her case plan for parenting services, and arguably for housing, she failed to comply with her case plan regarding mental health and substance abuse. Regarding housing, the record reflects that mother had been living with her boyfriend since July 2019, in a house that her boyfriend owned. The child protection specialist testified that mother's boyfriend "deeded" mother his house and that the house would be appropriate for the children. She also testified that mother had been working during most of this case. However, as to mental health and substance abuse discussed below, mother failed to comply with her case plan.

{¶ 45} The trial testimony clearly and convincingly supports the juvenile court's finding that mother has a chronic mental illness or chemical dependency that is so severe that it makes the parent unable to provide an adequate permanent home for the children at the present time and, as anticipated, within one year after the permanent custody hearing, pursuant to R.C. 2151.414(E)(2). Mother argues that she should be presumed not to have a mental illness because her mental-health diagnosis was never placed on the record even though she completed mental-health assessments during this case. However, all three SARs state that mother voluntarily hospitalized herself overnight for self-injurious behavior in December 2017, and she was diagnosed with major, severe, and recurrent depression and post-traumatic stress disorder. The juvenile court diagnostic clinic chose not to amend her diagnosis. Moreover, the record reflects that the juvenile court diagnostic clinic recommended that mother seek counseling and a medication evaluation. While testimony showed that mother did seek out her most recent mental health provider, who was geographically closer to where she was living, testimony also showed that mother did not follow through with CCDCFS's referrals for mental health services throughout the proceedings. Despite CCDCFS's referrals throughout the proceedings, mother began to engage in these services only a few months before the permanent custody hearing.

{¶ 46} As to mother's chemical dependency, the record shows that mother had a moderate cannabis use disorder and failed to comply with her case plan. Mother contends that CCDCFS failed to show that her marijuana use interfered with

her parenting. She argues that marijuana is legal in Ohio, she had a medical marijuana card from Michigan, and that she testified that she did not smoke near the children and did not get high. However, substance abuse services were included in mother's case plan, and she failed to comply. The child protection specialist testified that mother submitted to five or six drug screens, and her first negative screen was only two months before the permanent custody hearing. In addition to marijuana, mother tested positive for cocaine on multiple occasions. Mother has not completed a substance abuse program, was discharged from outpatient therapy for noncompliance, and has denied having a substance abuse problem. Uncle also expressed concern about the children reunifying with mother because of her history of drug use.

{¶ 47} Regarding R.C. 2151.414(E)(4) and R.C. 2151.414(E)(14), we do not find that the trial testimony clearly and convincingly supports the juvenile court's finding that mother has demonstrated a lack of commitment toward the children by failing to regularly support, visit, or communicate with them when able to do so, or that she is unwilling to prevent the child from suffering physical, emotional, or sexual abuse, or physical, emotional, or mental neglect. Testimony shows that mother regularly visited the children throughout the course of these proceedings. Uncle testified that mother visited the children weekly at his home and that the children looked forward to the visits. Uncle's partner testified that mother was "great" during her weekly visits. Although mother did not provide any monetary support to the children during these proceedings, she brought food for them during

some of their visits. Moreover, parenting services were part of mother's case plan, and the child protection specialist testified that mother completed those services.

{¶ 48} Because we need to find that clear and convincing evidence supported only one of the R.C. 2151.414(E) factors, and we find that clear and convincing evidence supported the trial court's finding pursuant to R.C. 2151.414(E)(1) and (2), the trial court did not err in finding that the children could not be returned to mother's custody within a reasonable time or should not be placed with mother.

## B. The Second Prong – Best Interest

{¶ 49} In her first assignment of error, mother argues that CCDCFS failed to show that the grant of permanent custody to CCDCFS would be in the children's best interest. Her arguments center around the R.C. 2151.414(E) factors discussed in the previous section and not the R.C. 2151.414(D)(1) best-interest factors. Nonetheless, we will consider R.C. 2151.414(D)(1) to evaluate whether CCDCFS met its burden.

{¶ 50} The trial court needs to find only one of the R.C. 2151.414(D)(1) factors in favor of permanent custody to terminate parental rights. *In re J.S.*, 8th Dist. Cuyahoga Nos. 101991 and 101992, 2015-Ohio-2701, ¶ 51, citing *In re Z.T.*, 8th Dist. Cuyahoga No. 88009, 2007-Ohio-827.

{¶ 51} The record clearly and convincingly supports the trial court's finding pursuant to R.C. 2151.414(D)(1)(c) that the children had been in the temporary custody of CCDCFS for 12 or more months of a consecutive 22-month period. CCDCFS obtained emergency custody of the children on May 21, 2018, and moved to modify temporary custody to permanent custody on May 21, 2019. The children

remained in the custody of CCDCFS for over 12 consecutive months, satisfying the R.C. 2151.414(D)(1)(c) factor.

{¶ 52} Although mother does not specifically raise this argument, we find that the record clearly and convincingly supports that permanent custody of the children to CCDCFS was in their best interest over legal custody with uncle. The child protection specialist testified that if CCDCFS were to obtain permanent custody of the children, their plan would be for aunt and her husband in Florida to adopt the children. Testimony at the permanent custody hearing showed that the children had a strong bond with aunt, and the GAL testified that E.C. and A.C. consistently reported that they wanted to live with aunt and her husband in Florida. The record reflects that aunt and her husband have housing, income, time, experience, and the desire to raise the children. While the record shows that uncle and his partner clearly love the children and have taken very good care of them, even uncle ultimately agreed that it would be in the children's best interest to live with aunt and her husband.

{¶ 53} After review, we find there was clear and convincing evidence to support the trial court's finding that it was in the children's best interest to be placed in the permanent custody of CCDCFS. Accordingly, we overrule mother's first assignment of error.

## III. Native American Ancestry

{¶ 54} In her second assignment of error, mother argues that the juvenile court erred in finding the children have no known Native American ancestry. In her

third assignment of error, mother contends that CCDCFS was obligated to treat the children as Indian Children under the Indian Child Welfare Act (25 U.S.C. 1901 *et seq.*, "ICWA") and as such failed to meet ICWA's heightened standard for the termination of parental rights. We will address mother's second and third assignments of error together for ease of discussion.

{¶ 55} We must review mother's second and third assignments of error under a plain error standard of review. In May 2018, the juvenile court included in its judgment entry that the children were not members of a federally recognized Indian tribe and were not eligible for membership in a federally recognized Indian tribe. Mother did not challenge this finding or ever raise the issue with the juvenile court before this appeal. As such, she has waived all but plain error. *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1997). Plain errors are those that prejudice the appellant and that '"are clearly apparent on the face of the record."' *Wells Fargo Bank, N.A. v. Lundeen*, 8th Dist. Cuyahoga No. 107184, 2020-Ohio-28, ¶ 12, quoting *Macintosh Farms Community Assn. v. Baker*, 8th Dist. Cuyahoga No. 102820, 2015-Ohio-5263, ¶ 8 . A "failure to timely advise a trial court of possible error, by objection or otherwise, results in a waiver of the issue for purposes of appeal" except in "those extremely rare cases where exceptional circumstances require [the plain error] application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings." *Goldfuss* at 121. Courts reviewing civil cases for plain error "must

proceed with the utmost caution." *Id.* Mother has the burden of demonstrating plain error. *Risner v. Ohio Dept. of Natural Resources*, 144 Ohio St.3d 278, 2015-Ohio-3731, 42 N.E.3d 718, ¶ 27.

{¶ 56} Mother argues that the juvenile court did not satisfy its burden under ICWA to determine whether the children were Indian children. She contends that since mother responded that the children have Native American ancestry, the juvenile court had the burden to investigate further to determine if the children met the definition of "Indian children." She argues that nobody asked the child protection specialists if they talked with the children's family to inquire about Native American ancestry and that nobody explained to mother the significance of Native American ancestry.

{¶ 57} Mother also contends that since CCDCFS did not know whether the children were members of a Native American tribe, CCDCFS should have treated the children like Indian children. In support of her argument, she points to 25 U.S.C. 1912(d)-(f), which outline requirements for remedial services, foster care placement, and parental rights termination, respectively. 25 U.S.C. 1912(f) provides that parental rights may not be terminated absent a determination, "supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Mother also points to the Bureau of Indian Affairs Guidelines for Implementing ICWA (the "*Guidelines*"), which state that an Indian child may not be removed from a parent

absent a showing that it is dangerous for the child to remain with his or her parent, as shown by evidence beyond a reasonable doubt, including expert testimony. *Guidelines* at 52, Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act (Dec. 2016), https://perma.cc/3TCH-8HQM. Mother argues that CCDCFS presented no expert witnesses and failed to meet ICWA's beyond-a-reasonable-doubt standard for the termination of parental rights.

{¶ 58} In 1978, Congress enacted ICWA to address the "'wholesale separation of Indian children from their families.'" *Guidelines* at 5, quoting 2 H.R. Rep. No. 95-1386, at 9 (1978). Congress found that

> an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions.

25 U.S.C. 1901(4).

{¶ 59} This court has explained the applicability of ICWA as follows:

> The ICWA provides exclusive jurisdiction to an Indian tribe over child custody proceedings in situations where the Native American child resides or is domiciled within its reservation. 25 U.S.C. 1911(a). Under the act, when an Indian child does not reside on a reservation, child custody proceedings may be initiated in a state court. 25 U.S.C. 1911(b). The act gives the subject Indian child's tribe the right to intervene in any state court proceeding involving foster care placement or the termination of parental rights. 25 U.S.C. 1911(c). The act imposes a duty on state courts in involuntary custody proceedings "where the court knows or has reason to know that an Indian child is involved," to have the applicable children's services agency notify the Indian child's tribe of the proceedings and its right to intervene. 25 U.S.C. 1912.

*In re J.B.*, 8th Dist. Cuyahoga No. 106045, 2018-Ohio-1201, ¶ 17.

{¶ 60} ICWA applies to a child custody proceeding in state court only if the child meets the definition of an "Indian child" under ICWA. *Id.* at ¶ 18; *Guidelines* at 11. ICWA defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" 25 U.S.C. 1903(4). "ICWA does not apply simply based on a child or parent's Indian ancestry. Instead, there must be a political relationship to the tribe." *Guidelines* at 10.

{¶ 61} The party "asserting the applicability of the ICWA" has the burden to show that the child satisfies ICWA's definition of an "Indian child." *In re J.B.* at ¶ 19. To meet this burden, the party "must do more than raise the possibility that a child has [N]ative American ancestry." *Id.*

{¶ 62} Under ICWA, state courts have a duty to ask the participants in a child custody proceeding whether they know or have reason to know that the child is an Indian child, and must do so "at the commencement of the proceeding." 25 C.F.R. 23.107(a); *In re J.B.*, 8th Dist. Cuyahoga No. 106045, 2018-Ohio-1201, at ¶ 20. State courts must also "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." 25 C.F.R. 23.107(a).

{¶ 63} Here, the juvenile court asked mother at the May 22, 2018 emergency custody hearing whether there is any Native American ancestry in her or father's ancestry. Mother responded, "yes." The juvenile court then asked mother if the

children were eligible for membership in a tribe, and mother said that she did not know but that the children's great grandmother on father's side was a Blackfoot Indian. The court explained that the existence of Native American ancestry alone is insufficient for tribe membership and found that there is no known Native American ancestry that would render the children eligible for tribe membership. The court instructed the county and mother to notify the court and the appropriate tribe representative if they discover additional information that would indicate the children are eligible for tribe membership. Throughout the subsequent hearings in this case, the juvenile court asked the CCDCFS child protection specialist if the children's file contained any known Native American ancestry, and the child protection specialist consistently replied, "no."

{¶ 64} In support of her argument that the juvenile court should have done more to determine whether the children were Indian children, mother cites Section 23.107(b) of the regulations implementing ICWA:

> (b) If there is reason to know the child is an Indian child, but the court does not have sufficient evidence to determine that the child is or is not an "Indian child," the court must:
>
> (1) Confirm, by way of a report, declaration, or testimony included in the record that the agency or other party used due diligence to identify and work with all of the Tribes of which there is reason to know the child may be a member (or eligible for membership), to verify whether the child is in fact a member (or a biological parent is a member and the child is eligible for membership); and
>
> (2) Treat the child as an Indian child, unless and until it is determined on the record that the child does not meet the definition of an "Indian child" in this part.

25 C.F.R. 23.107(b).

{¶ 65} However, 25 C.F.R. 23.107(b) applies only if the court has "reason to know the child is an Indian child." *Guidelines* at 12 ("If the court has 'reason to know' that a child is a member of a Tribe, then certain obligations under the statute and regulations are triggered[.]"). Mother contends that the juvenile court had reason to know the children were Indian children because mother told the juvenile court that their great grandmother was a Blackfoot Indian, which would make the children one-ninth Native American. She contends that this "blood quantum" is sufficient for membership for some tribes, and that the children may have additional relatives who are Blackfoot Indian, which would increase the children's blood quantum. In support of her argument, mother points to "U.S. band's Ordinance 14" attached as an exhibit to mother's brief. This exhibit appears to be a quit claim deed, which does not mention any requirements for tribe membership.

{¶ 66} Regardless, 25 C.F.R. 23.107(c) explains that a court has "reason to know" if a child is an Indian child if one of six factors apply:

(1) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that the child is an Indian child;

(2) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child;

(3) The child who is the subject of the proceeding gives the court reason to know he or she is an Indian child;

(4) The court is informed that the domicile or residence of the child, the child's parent, or the child's Indian custodian is on a reservation or in an Alaska Native village;

(5) The court is informed that the child is or has been a ward of a Tribal court; or

(6) The court is informed that either parent or the child possesses an identification card indicating membership in an Indian Tribe.

{¶ 67} Native American ancestry alone does not meet any of the factors of 25 C.F.R. 23.107(c). Therefore, even though mother told the juvenile court that the children had Native American ancestry, the juvenile court did not have reason to know that the children were Indian children. The juvenile court satisfied its burden under ICWA to ask the proceeding participants at the beginning of this case whether they knew or had reason to know that the children are Indian children.

{¶ 68} Moreover, mother (not CCDCFS) had the burden to show that the children met the statutory definition of "Indian children" because mother is the party asserting the applicability of ICWA. *In re J.B.*, 8th Dist. Cuyahoga No. 106045, 2018-Ohio-1201, at ¶ 19. Mother did not show that the children met the statutory definition of "Indian children." Therefore, ICWA did not apply to this proceeding. As such, whether CCDCFS met ICWA's beyond-a-reasonable-doubt standard to terminate parental rights is irrelevant.

{¶ 69} Accordingly, the juvenile court did not err in finding that the children have no Native American ancestry that would render the children eligible for tribe membership, and CCDCFS was not obligated to treat the children as Indian children under ICWA. We therefore overrule mother's second and third assignments of error.

{¶ 70} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
EILEEN A. GALLAGHER, J., CONCUR

Permanent custody; R.C. 2151.414; Indian Child Welfare Act

The juvenile court did not err in granting permanent custody of the children to the Cuyahoga County Division of Children and Family Services because the children cannot be placed with either parent within a reasonable time or should not be placed with either parent, and permanent custody was in the children's best interest. The juvenile court did not err in finding that the children have no known Native American ancestry that would render them eligible for tribe membership. The agency was not obligated to treat the children as Indian children under the Indian Child Welfare Act.